## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

------------------------------------------------------x
                                                      :
In re                                                 :    **Chapter 11**
                                                      :
**GOLFSMITH INTERNATIONAL**                           :    **Case No. 16-_____ (___)**
**HOLDINGS, INC.,** *et al.*,                         :
                                                      :    **Joint Administration Requested**
            **Debtors.**[1]                           :
                                                      :
------------------------------------------------------x

## DECLARATION OF BRIAN CEJKA IN SUPPORT OF
## THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Brian E. Cejka, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("**CRO**") of Golfsmith International Holdings, Inc. ("**GS USA**") and its debtor affiliates in the above-captioned chapter 11 cases (together with GS USA, the "**Debtors**" or "**Golfsmith**").[2]  I am also the CRO of the Debtors' non-Debtor Canadian affiliates (collectively, "**Golf Town**" and, together, with Golfsmith, "**GSI**" or the "**Company**").  Certain of the Golf Town entities have commenced a proceeding (the "**CCAA Proceeding**" and, together with these chapter 11 cases, the "**GSI Restructuring Proceedings**") under the Companies' Creditors Arrangement Act (the "**CCAA**") in the Ontario

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  Golfsmith International Holdings, Inc. (4847); GMAC Holdings, LLC (3331); Golf Town USA Holdco Limited (5562); Golf Town USA Holdings Inc. (7038); Golf Town USA, L.L.C. (0259); Golfsmith 2 GP, L.L.C. (2218); Golfsmith Europe, L.L.C.(2408); Golfsmith Incentive Services, L.L.C. (2730); Golfsmith International, Inc. (7337); Golfsmith International, L.P. (4257); Golfsmith Licensing, L.L.C. (5499); Golfsmith NU, L.L.C. (2404); and Golfsmith USA, L.L.C. (2405). The Debtors' corporate headquarters is located at 11000 North IH-35, Austin, TX 78753.

[2] In addition to serving as the Company's CRO, I am a Managing Director at Alvarez & Marsal North America, LLC ("**A&M**"), a leading global business advisory firm with 47 offices worldwide and over 2,600 professionals. A&M was retained by the Debtors on September 13, 2016 to provide the Debtors with a CRO and financial advisory services.

Superior Court of Justice (Commercial List) in Canada (the "**Canadian Court**").[3]   A chart depicting the organizational structure of the Company is annexed hereto as **Exhibit "A."**

2.       I submit this declaration (the "**Declaration**") in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") and pleadings filed on the date hereof (the "**Petition Date**") seeking various types of "first day" relief (collectively, the "**First Day Motions**").   The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession and minimize the adverse effects of the chapter 11 filings on their businesses.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate their businesses during the pendency of their chapter 11 cases with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and best serves the Debtors, their estates, and all parties in interest.  The facts set forth in each First Day Motion are incorporated herein by reference.

3.       I am familiar with the Debtors' day-to-day operations, books and records, businesses, and financial affairs.  Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and other professionals; information provided to me by employees working under my supervision; or my opinion based

---

[3] Golf Town Canada Inc., Golf Town Holdings Inc., and Golf Town GP II Inc. are the applicants in the CCAA Proceeding (the "**Applicants**").  Because the Debtors' other non-Debtor Canadian affiliates, Golf Town Operating Limited Partnership and Golfsmith International Holdings L.P., are partnerships and not "companies" under the CCAA, they are not Applicants in the CCAA Proceeding (the "**Non-Applicants**").  Instead, the Applicants have requested that the Canadian Court extend applicable protections and authorizations to the Non-Applicants in order to preserve the value of GSI's businesses.

upon experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is intended to provide a summary overview of the Debtors' businesses and the need for their restructuring under chapter 11 of the Bankruptcy Code. This Declaration has been organized into five sections. The first section is a preliminary statement regarding the Debtors' commencement of these chapter 11 cases. The second section provides background information on the Debtors' businesses and operations. The third section details the Debtors' capital structure. The fourth section describes the events leading to the commencement of these chapter 11 cases and the Debtors' prepetition restructuring efforts. The fifth section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I.

## Preliminary Statement

5.      GSI is one of North America's largest specialty retailers of golf equipment, apparel, and accessories, and one of the leading golf retail businesses in the world. GSI's omni-channel retail approach focuses exclusively on golf-related products, and offers customers the convenience of shopping in Golfsmith and Golf Town stores, online through its e-commerce websites, or through its direct mail catalogs.

6.      Golfsmith's operations historically have been profitable and buttressed by a wide-ranging, loyal customer base. The surge in the popularity of golf at the turn of the century coincided with the rise of professional golfer Tiger Woods' success. Golfsmith responded to what has been dubbed the "Tiger Woods Phenomenon" by rapidly expanding its businesses and increasing its store presence in targeted urban markets. Beginning in 2011, in an

effort to maintain its competitive edge during the rise of the sports "superstore," Golfsmith began pursuing a larger format store strategy.  Golfsmith's expansion efforts continued through the following year and reached their apex in July 2012 with the formation of Golfsmith International Holdings LP ("**GSI Holdings**").  GSI Holdings was formed in connection with the merger of United States-based Golfsmith and Canadian-based golf retailer Golf Town (the "**Merger**").  GSI Holdings owns and controls Golfsmith and Golf Town, and operates 109 Golfsmith stores in the U.S. and 55 Golf Town stores in Canada.  The Merger succeeded in joining two companies that had been serving golfers in North America for more than four decades, with the intention of allowing the Company to pursue an aggressive growth strategy to maximize its footprint in the golf retail industry.

7.    As set forth in further detail below, GSI's capital structure consists of (i) a first lien ABL Credit Facility (as hereinafter defined) under which approximately $100.7 million is outstanding (the "**ABL Credit Facility Obligations**") and (ii) 10.50% second lien Senior Secured Notes (as hereinafter defined) due 2018, in the aggregate outstanding amount of CDN$125 million.  All of the Debtors and the Golf Town affiliates that commenced a proceeding under the CCAA are obligors under the ABL Credit Facility Obligations and the Senior Secured Notes.

8.    Recently, economic downturns, industry trends, and global shifts in consumer behavior all have put significant pressure on GSI's operational performance.  Beginning in 2008, the golf industry experienced a steady decline as golf participation slowed during the recession.  The retail industry as a whole was severely impacted by the recession, and, as a result, specialty retailers like GSI, which focuses on leisure products, were hit particularly hard.   This period also marked the beginning of a consistent shift by consumers away from

4

shopping in traditional "brick and mortar" retail stores toward a preference for the convenience provided by shopping on e-commerce platforms.  At the same time, the enthusiasm underpinning the "Tiger Woods Phenomenon" significantly waned.  Unfortunately, the rippling effect of these market factors coincided with GSI's company-wide expansion efforts, leaving Golfsmith with an oversized store footprint.

9.      In the wake of the Merger, GSI began to feel the effects of its expanded store portfolio and disproportionate presence in over-saturated markets.  Higher occupancy costs and reduced store-level productivity heightened the liquidity challenges already posed by GSI's capital structure.  To address these issues, the Company began pursuing various strategic restructuring alternatives to re-stabilize its businesses.

10.      Since 2014, GSI has taken a number of steps to improve its liquidity and operational performance.  As discussed in further detail below, these efforts have included the pursuit of recapitalization and out-of-court strategic restructuring alternatives, securing additional collateral to increase available borrowings under the ABL Credit Facility, negotiations with landlords to secure more competitive lease terms, pursuing accelerated lease buyouts, securing improved payment terms with key vendors during off-season periods, reducing employee headcount, and selling certain non-core assets to generate additional capital.  Despite the Company's best efforts, however, this process did not sufficiently shrink Golfsmith's underperforming store base and optimize its lease portfolio—two objectives that are indispensable to Golfsmith's successful restructuring.  The Company's EBITDA cannot support its current capital structure.

11.      In recent months, several of the Company's key vendors have tightened trade terms, constricting the Company's ability to access inventory and further shrinking the

RLF1 15165431V.1

Company's available borrowings under the ABL Credit Facility.  This vicious cycle has severely limited the Company's ability to dedicate essential time and resources to investing in operational growth commensurate with consumer trends.

12.     To address these concerns, the Company conducted an extensive auction process prior to the commencement of these chapter 11 cases.  This process culminated in the Company receiving a binding proposal for the sale of its Canadian business operating as Golf Town (the "**Golf Town Transaction**") to an entity (the "**Golf Town Purchaser**") owned by Fairfax Financial Holdings Limited ("**Fairfax**") and CI Investments Inc. ("**CI**").  The proceeds of the Golf Town Transaction will be used to significantly reduce the Debtors' ABL Credit Facility Obligations.  Concurrently with the commencement of these chapter 11 cases, certain of the Golf Town entities are commencing the CCAA Proceeding to obtain approval of and implement the Golf Town Transaction.

13.     The Debtors have commenced these chapter 11 cases to stabilize their businesses and to pursue an operational and financial restructuring around a smaller footprint of profitable Golfsmith stores (the "**Golfsmith Restructuring**").  The Golfsmith Restructuring would culminate in, among other things, an operational restructuring of the Debtors' businesses that will result in closing certain of the Debtors' underperforming stores, a nearly 72% reduction of the Debtors' obligations under the Senior Secured Notes, and the refinancing of the remaining ABL Credit Facility Obligations with a new working capital facility.  The Company believes that the Golf Town Transaction, which will result in a significant repayment of the ABL Credit Facility Obligations, and the Golfsmith Restructuring are the best available outcome for the Company and its stakeholders.  Fairfax and CI, which collectively hold approximately 40% of the Company's Senior Secured Notes, have entered into an agreement with the Company (the

"**Restructuring Support Agreement**") pursuant to which they and potentially other Senior Secured Noteholders that hereafter sign onto the Restructuring Support Agreement (collectively, the "**Supporting Noteholders**") will support the Golf Town Transaction and the Golfsmith Restructuring.  A copy of the Restructuring Support Agreement is attached hereto substantially in the form as **Exhibit "B."**

14.     If implemented, the transactions described above will result in the going-concern sale of Golf Town and a reorganization of Golfsmith.  The transactions will provide a comprehensive solution for the Company and will be the best outcome for its suppliers, employees, customers, and other economic stakeholders.  As part of its interim financing arrangements and in order to maximize the value of their estates and creditor recoveries, the Debtors are undertaking to complete the process that they commenced last June for the sale of substantially all of their assets (the "**Sale Process**") on a dual track with the Golfsmith Restructuring.  While the Sale Process proceeds, the Company intends to advance the Golfsmith Restructuring with the Supporting Noteholders and to take steps to refinance or repay the remaining ABL Credit Facility Obligations.  In the event that the Sale Process generates a higher or otherwise better value for the Debtors' assets, the Debtors will, in consultation with their creditor constituencies, determine whether a sale of Golfsmith should be pursued in lieu of the Golfsmith Restructuring.

15.     The Golf Town Transaction and the Restructuring Support Agreement are the result of an extensive exploration of strategic alternatives by the Company and its professional advisors to address GSI's financial and operational challenges and to maximize value for the benefit of its stakeholders.

16.     The pressures that have led the Debtors to commence these chapter 11 cases are not unique to Golfsmith; rather, a number of other retailers, including direct competitors such as Sports Authority, sporting goods retailers such as Sports Chalet and City Sports, and other specialty apparel retailers such as Quiksilver, American Apparel, Aéropostale, and Pac-Sun, have all sought chapter 11 protection in the face of similar market conditions recently.  In addition, Wal-Mart, Macy's, Sears, J.C. Penny, Ralph Lauren, Jos. A. Bank, and Staples, to name a few, are retailers that have announced significant store closures in 2016.

17.     As discussed in further detail below, market trends indicate that a turnaround in the golf retail market could be imminent.  Notably, golf participation in the United States has stabilized and begun to experience material growth for the first time since the recession-era decline.  The Company intends to use the GSI Restructuring Proceedings to strategically re-size its businesses and take advantage of this momentum.

<u>**The Debtors' Businesses**</u>

A.     **History and Formation**

    (i)     ***Golfsmith***

18.     In 1967, Carl and Barbara Paul founded Golfsmith and began running its operations from their home in Edison, New Jersey.  Golfsmith began as a provider of custom-made golf clubs, golf club-making components, and golf club-repair services. Golfsmith opened its first "brick and mortar" retail store in Austin, Texas in 1972, and circulated its first general catalog selling third-party products in 1975.

19.     Golfsmith primarily operated as a catalog-based business until the 1990s, when it embarked on a large-scale expansion.  In 1992, Golfsmith moved to GSI's present headquarters, a 40-acre campus that includes corporate administration offices, a practice driving range, a 30,000-square-foot Golfsmith superstore, and 240,000 square feet of shipping and

distribution facilities (collectively, the "**Golfsmith Campus**").  In 1995, Golfsmith began an aggressive retail expansion with the opening of superstores in Houston and Dallas, Texas and Denver, Colorado.  In 1997, Golfsmith launched its first e-commerce website to further expand its direct-to-consumer business.

20.     In October 2002, Golfsmith sold a majority share of its company to an investment fund managed by First Atlantic Capital, Ltd. ("**First Atlantic**").  On June 15, 2006, with 56 retail stores in operation, First Atlantic executed an initial public offering of Golfsmith and listed the company's common stock on the NASDAQ Exchange under the symbol "GOLF."

**(ii)**     *Golf Town*

21.     Golf Town was founded in 1998 with the objective of becoming the market leader in the Canadian retail golf industry.  Golf Town opened its first store in Toronto, Ontario, Canada in 1999.  It quickly expanded to open 54 retail stores across Canada and became the nation's largest retailer of golf equipment, apparel, and accessories.  In 2004, Golf Town became a publicly-traded income trust and was listed on the Toronto Stock Exchange under the symbol "GLF."  In September 2007, Golf Town was acquired for CAD$240 million and taken private by Toronto-based OMERS Private Equity on behalf of OMERS Administration Corporation, the administrator of the OMERS pension plan ("**OMERS**").  In 2011, Golf Town expanded into the U.S. market by opening seven stores in the greater Boston area.

**(iii)**     *Golfsmith – Golf Town Merger*

22.     On July 24, 2012, Golfsmith and Golf Town closed a merger transaction, which was coordinated by OMERS.  The primary objective of the Merger was to unite Golfsmith and Golf Town to form the largest specialty golf retailer in North America that offered the broadest selection of branded and proprietary golf product.  The Merger was consummated by Golf Town's purchase of the issued and outstanding common shares of Golfsmith for

9

approximately $109 million,[4] and the amalgamation of Golfsmith and Golf Town, establishing GSI.   The Merger was financed by an approximately $132 million equity contribution by OMERS.

**B.**     **The Debtors' Current Business Operations**

**(i)**     *Retail Stores*

23.     GSI currently operates 109 Golfsmith stores across the U.S. and 55 Golf Town stores in Canada.[5]   Golfsmith maintains a diversified geographic footprint with an established retail presence in key markets across the U.S.  Golfsmith stores are typically located in high-traffic retail centers with convenient access, and range in size from approximately 8,000 to 60,000 square feet, with an average size of 23,250 square feet.

---

[4] All references to dollars ($) herein are to U.S. dollars unless otherwise noted.

[5] In April 2013, each of the seven (7) Golf Town-branded retail stores located in the United States were rebranded as Golfsmith stores.



| **Map of GSI Stores** |
| :---: |

Golfsmith's retail stores offer consumers an interactive and experiential shopping experience that includes access to golf club demonstrations, virtual golf simulators, indoor driving nets, swing analyzers, putting greens, golf lessons, and ball-launch monitor technology.  Golfsmith also offers on-site clubmaking, custom club-fitting, and club repair services in a number of its retail stores.  The Debtors sublease space in a majority of their stores to GolfTEC Learning Centers to provide precision club-fitting and Professional Golf Associate-certified golf instructions to customers.  Golfsmith's interactive stores define it as a true "destination retailer."  Golf Town operates similarly-sized stores in Canada, and also offers an experiential shopping experience.

(ii)     *Direct-to-Consumer Business Lines*

24.     Golfsmith's direct-to-consumer business consists of its traditional catalog business and e-commerce channel.  Golfsmith has a nearly 50-year history as a catalog retailer

and is one of the industry's leading golf specialty catalog retailers. Its principal catalog publications are the Golfsmith Consumer Catalog, which targets the avid golfer, and the Golfsmith Clubmaking Catalog, a specialty catalog that targets customers who want to design their own custom clubs. Golfsmith distributes its catalogs both online and by mail.

25.     The Company also maintains a leading e-commerce platform, which accounts for approximately 10% of its revenues. In 2015, www.golfsmith.com received over 400,000 orders and had an average of approximately 29 million unique site visits on an annual basis. Golfsmith's website complements its retail stores and catalogs by building customer awareness of the Golfsmith brand and acting as an effective marketing vehicle for its products and services. In addition to generating revenues from online sales, the website also drives customer traffic to Golfsmith stores, as one of the most-used features on the website is the store locator function.

26.     Additionally, the Company maintains relationships with certain third-party retailers, such as internet-based retailer, Amazon, which allow customers to purchase Golfsmith merchandise through non-Golfsmith operated channels for a fee of approximately 10 to 18% of the price of Golfsmith merchandise sold. These arrangements increase Golfsmith's exposure to customers, and particularly those who are more inclined to shop on convenience-driven e-commerce platforms.

  **(iii)**  *Product Mix and Vendors*

27.     Golfsmith offers an extensive product selection across each of its sales channels, featuring leading third-party golf and sports brands, Golfsmith-owned proprietary brands, and second generation, pre-owned products. Golfsmith's product mix caters to a wide range of customers from casual golfers to enthusiasts. Approximately one-half of GSI's sales are

12

attributable to golf equipment, one-quarter to golf apparel sales, and one-quarter to consumables and accessories (*e.g.,* bags, water bottles, and GPS products).

28.     GSI maintains long-established relationships with the major golf equipment, apparel, and accessory manufacturers, including, among others, Titleist, TaylorMade, Callaway, Cobra, Ping, Mizuno, Cleveland Golf, Scotty Cameron, Odyssey, FootJoy, Adidas, Ecco, Puma, and Under Armour. Golfsmith maintains branded apparel boutiques in select stores for a number of its key vendors. The Company generally does not have long-term supply contracts with its approximately 330 vendors, but rather makes its merchandise orders on a purchase-order basis.

29.     Golfsmith's proprietary private-label products are sourced primarily from contract manufacturers located in Asia, who work in conjunction with domestic product designers to produce equipment, apparel, and accessories targeted towards value-seeking consumers. Golfsmith-owned proprietary brands include Clubmaker®, Golfsmith®, Hank Haney®, J.G.Hickory®, Killer Bee®, Lynx®, Maggie Lane®, MacGregor®, Profinity®, Snake Eyes®, TourTrek®, XPC®, Zevo® and ZTech®. Sales of Golfsmith's private-label products account for approximately eight percent (8%) of Golfsmith's revenue.

30.     Golfsmith also sells second-generation and pre-owned golf equipment through its in-store and online channels. Golfsmith sources used golf equipment from its trade-in program, under which customers can trade in used clubs and receive a credit to purchase new Golfsmith products. Sales of used golf clubs account for approximately five percent of GSI's club sales.

**(iv)     *Distribution***

31.     Nearly two-thirds of products sold in GSI's stores are shipped directly by vendors to Golfsmith and Golf Town stores. Golfsmith also operates a 240,000 square-foot

distribution and fulfillment center on the Golfsmith Campus to manage e-commerce orders and inventory replenishment for retail stores and receive Golfsmith's private-label goods. Golfsmith outsources to third-party transportation providers the shipment of merchandise from its distribution centers to retail stores and customers.

## C.     The Debtors' Cost Structure

32.     Golfsmith's cost structure includes certain fixed and variable costs, including, among other things, costs attributable to obligations to employees, real estate, marketing, administrative expenses, and purchasing, warehousing, and shipping merchandise.

### (i)     *Trade Expenses*

33.     Golfsmith's greatest expense is its merchandise, which expense totaled approximately $307 million in 2015. Golfsmith estimates that its cost of goods sold equals approximately 62% of its net sales. Although GSI has sourcing arrangements with over 330 suppliers, Golfsmith sources approximately 45% of its merchandise from its three largest suppliers, and approximately 77% of its merchandise from its 10 largest suppliers. Golfsmith's profitability is highly dependent on maintaining strong relationships and favorable trade terms with these key suppliers. Historically, as a result of its high purchase volumes, Golfsmith has been able to command strong supplier rebates and obtain products at lower costs than many of its competitors. In recent months, however, many of GSI's key vendors have reacted to news of GSI's liquidity challenges by imposing onerous trade terms, and, in several instances, demanding cash in advance of delivering merchandise to GSI's stores.

34.     The timing of this trade contraction affected the Debtors at a critical time—right in the middle of the warm-weather golf season. Golfsmith's business is highly seasonal, with peak sales occurring from April to July, the period leading up to and during the warm-weather golf season, and in advance of the December holiday gift-giving season. The

Debtors hope to use these chapter 11 cases to implement the Golfsmith Restructuring or to complete a timely sale of their businesses, both of which they believe will restore the confidence of their vendors.  It is crucial to the success of Golfsmith's businesses that it be able to access new inventory from its key suppliers in the period leading up to the holiday sales season.  If Golfsmith is unable to obtain "new generation" golf equipment and other merchandise from its suppliers due to overly-restrictive trade terms, Golfsmith risks losing customers to competitors during one of the most important revenue-generating periods in Golfsmith's fiscal year. Accordingly, it is vital to the success of the Debtors' chapter 11 cases and their businesses as a going concern that the Debtors be able to reinstate reasonable trade terms with their key suppliers, which will enable the Debtors to continue offering customers the product selection and quality they have come to expect from Golfsmith's iconic stores.

    **(ii)**    ***Employee-Related Costs***

35.    Golfsmith currently employs approximately 2,300 employees, comprised of approximately 1,050 full-time, 1,150 part-time, and 110 seasonal employees.  None of Golfsmith's workforce is unionized.  Golfsmith also hires independent contractors from time to time.  On average, Golfsmith's gross payroll is approximately $2.3 million every two weeks. The Debtors provide or contribute to a number of benefit plans that provide medical, dental, vision, life, and disability insurance and other ancillary benefits to their employees.  Payments by the Debtors on account of these plans totaled approximately $10.2 million in 2015.  The Debtors also pay annual premiums on account of workers' compensation insurance.  In 2015, Golfsmith's employee-related obligations totaled approximately $72.6 million, which accounted for approximately 14.7% of Golfsmith's net sales.

  (iii)  ***Real Estate Obligations***

  36.  Golfsmith leases all but one of its store locations under operating leases that expire on various dates through November 2029. Many of the Debtors' lease agreements include rent escalation clauses and contingent rent provisions that correlate with Golfsmith's percentage of gross sales in excess of specified levels. In 2015, the Debtors' store lease obligations totaled approximately $59.7 million, which accounted for approximately 12.1% of Golfsmith's net sales. Golfsmith also owns the Golfsmith Campus located in Austin, Texas, which is home to Golfsmith's sole non-leased retail location. The Debtors' real property and personal property tax obligations related to the Golfsmith Campus amount to approximately $962,000 each year.

  37.  Golfsmith's profitability has been adversely impacted by outsized occupancy costs at its stores. Accordingly, and as set forth in further detail below and in the Store Closing Procedures Motion (as hereinafter defined), the Debtors have targeted for their initial store closures approximately 20 locations that are underperforming, operate under long-term, above-market leases located in oversaturated markets, and/or are oversized. A crucial component of the Debtors' strategy will involve restructuring around and conducting a sale of only its highest-performing stores in key markets and renegotiating leases with over-market terms to reduce occupancy expenses.

  (iv)  ***Marketing and Advertising Expenses***

  38.  To maintain its market share and top-of-mind brand awareness with consumers, the Debtors spend a significant amount of money on marketing and advertising programs designed to promote Golfsmith's extensive product selection, unique customer services, and seasonal promotions and events. In 2015, the Debtors spent approximately $16 million on marketing and advertising, which amount represented approximately 3.2% of

Golfsmith's net sales.  The Debtors market their businesses by utilizing in-store promotional events and a combination of print, television, radio, direct mail, e-mail, search engine marketing, online and mobile, social media, outdoor media, and grassroots advertising programs.  The Debtors' largest marketing expenditure is television advertising, which includes targeted 15-second commercial spots on networks covering major golf championships and other various cable networks.  Golfsmith adjusts the frequency and intensity of its marketing activities based on the seasonal period within particular markets, and with an emphasis on key shopping periods, such as the weeks leading up to the golf season, Father's Day, and the December holidays.

## II.

## Corporate and Capital Structure

### A.   Corporate Structure

39.   All but one of the Debtors are organized in the state of Delaware. Golfsmith Incentive Services, LLC, is a Texas limited liability corporation.  As set forth in the Consolidated Corporate Ownership Statement attached to the Debtors' voluntary petitions, GSI Holdings, a Canadian limited partnership, directly owns 100% of the equity interests of Golf Town USA Holdings, Inc. ("**Golfsmith Parent**"), which directly owns 100% of the equity interests in GS USA.  GSI Holdings is not a Debtor in these chapter 11 cases, but is an Applicant in the CCAA Proceeding.  Each of the remaining Debtors is a subsidiary of GSI Holdings or Golfsmith Parent.

### B.   Directors and Officers

40.   The following table sets forth the names of the members of GS USA's current board of directors and senior management:

| Name | Position |
|------|----------|
| David Roussy | Director; President; Chief Executive Officer |
| David Bushland | Director; Vice President; Chief Financial Officer |
| Phil Mauchel | Director |
| Rick Hill | Vice President & Secretary |
| Anna Jobe | Vice President & Controller |

41.     A schedule listing the members of the boards of directors and senior management of the remaining Debtors, as applicable, is attached hereto as **Exhibit "C."**

## C.     GSI's Capital Structure

42.     As of September 13, 2016, the Company's outstanding funded debt obligations total approximately $195.7 million (the "**Prepetition Indebtedness**"), which obligations are described in greater detail below. The Prepetition Indebtedness funds the operations of Golfsmith and Golf Town.   The borrowers, issuers, and guarantors of the Prepetition Indebtedness include Golfsmith entities and Golf Town entities.   Each of the Debtors is a borrower, issuer, or guarantor of the Prepetition Indebtedness.

### (i)     *ABL Credit Agreement*

43.     In connection with the Merger, certain of the Debtors entered into that certain Credit Agreement dated July 24, 2012 (as amended, supplemented, or otherwise modified from time to time, the "**ABL Credit Agreement**"), by and among Golf Town Canada Inc., Golf Town USA Inc., GS USA, Golf Town GP II Inc., Golf Town Operating Limited Partnership, Accolade Reaction Promotion Group USA Inc., Golfsmith Europe, L.L.C., Golfsmith Licensing, L.L.C., Golfsmith Incentive Services, LLC, Golfsmith 2 GP, L.L.C., Golfsmith International, Inc., Golfsmith International, L.P., Golfsmith NU, L.L.C., and Golfsmith USA, L.L.C., and other borrowers party thereto (collectively, the "**ABL Borrowers**"), and each of the Debtor and non-

18

Debtor guarantors named therein (collectively, the "**ABL Guarantors**"),[6] Antares Capital LP,

("**Antares**"), as successor in interest to the agent for the lenders (the "**ABL Agent**"),[7] and the

other lenders party thereto (collectively, the "**ABL Lenders**" and, together with the ABL Agent,

the "**ABL Secured Parties**").

44.    Pursuant to the ABL Credit Agreement, the ABL Lenders provided the

ABL Borrowers with (i) a $135 million asset-based revolving credit facility (the "**ABL**

**Revolving Credit Facility**"), which includes a $10 million subfacility available for the issuance

of letters of credit; and (ii) a CDN$15 million non-revolving first-in, last-out term loan facility

(the "**FILO Facility**" and, together with the ABL Revolving Credit Facility, the "**ABL Credit**

**Facility**").

45.    The ABL Revolving Credit Facility terminates on the earliest of (i) July

24, 2017, (ii) six months prior to the scheduled maturity of the Senior Secured Notes, which is

currently January 24, 2018, and (iii) the occurrence of a termination event as provided under the

ABL Credit Agreement.  The FILO Facility terminates on the earlier of (i) July 24, 2017 and (ii)

six months prior to the scheduled maturity of the Senior Secured Notes.

46.    The ABL Credit Facility Obligations are secured pursuant to that certain

Guaranty and Security Agreement dated July 24, 2012 (as amended, supplemented, or otherwise

modified from time to time, the "**ABL Security Agreement**").  Pursuant to the ABL Security

Agreement, each of the ABL Guarantors granted a first-priority lien on substantially all of their

---

[6] The ABL Guarantors consist of the following entities: (i) each of the Debtor ABL Borrowers, (ii) each of the non-Debtor ABL Borrowers, (iii) GT Canada and each of its subsidiaries listed on the Corporate Organizational Chart attached hereto as Exhibit "A," and (iv) Golfsmith Parent.

[7] The original swingline lender and ABL Agent under the ABL Credit Agreement was General Electric Capital Corporation ("**GECC**").  On August 21, 2015, Antares Holdings, a subsidiary of Canada Pension Plan Investment Board Credit Investments Inc., acquired Antares from GECC.  On or around July 2015, Antares became the successor in interest to GECC as ABL Agent.

property, including, but not limited to, all accounts, monies, cash, cash equivalents, commodities, goods, inventory, equipment, chattel paper, securities and all other investment property, contract rights, insurance proceeds, deposit accounts, security accounts, commodities accounts, documents, and general intangibles (collectively, the "**Prepetition Collateral**"), in favor of the ABL Agent for the benefit of the ABL Lenders and certain other secured parties.

47.    As of September 13, 2016, the ABL Borrowers' borrowing base under the ABL Revolving Credit Facility (the "**Revolver Borrowing Base**") and the FILO Facility (the "**FILO Borrowing Base**" and, together with the Revolver Borrowing Base, the "**ABL Borrowing Base**") was $91,946,498 and $5,329,281, respectively.  The ABL Borrowing Base is reduced by certain prescribed reserves and other reserves that may be established by the ABL Agent (the "**ABL Borrowing Base Reserves**"). In its reasonable credit judgment, the ABL Agent may modify the ABL Borrowing Base Reserves.  The ABL Borrowing Base is based on the estimated value of the Debtors' sales revenues, inventory, real estate, indebtedness, and other relevant factors consistent with customary retail lending criteria.

48.    As of September 13, 2016, the Debtors' outstanding ABL Credit Facility Obligations amount to approximately $100.7 million, which consists of (i) approximately $89.3 million drawn under the ABL Revolving Credit Facility, and (ii) $11.4 million outstanding under the FILO Facility.

**(ii)    *Senior Secured Notes***

49.    On July 24, 2012, in connection with the Merger, GS USA (also referred to as the "**U.S. Issuer**") and non-Debtor Golf Town Canada Inc. ("**GT Canada**" or the "**Canadian Issuer**") issued, in a private placement, 125,000,000 units ("**Units**") for aggregate gross proceeds of CDN$125 million.  Each Unit consists of (i) CDN$0.64 principal amount of 10.50% senior secured second lien notes of GT Canada due July 24, 2018 (the "**GT Canada**

20

**Senior Secured Notes**"), and (ii) CDN$0.36 principal amount of 10.50% senior secured second lien notes of GS USA due July 24, 2018 (the "**GS USA Senior Secured Notes**" and, together with the GT Canada Senior Secured Notes, the "**Senior Secured Notes**"), pursuant to that certain Indenture (the "**Senior Secured Note Indenture**") among GT Canada and GS USA, as issuers, each of the non-Debtor and Debtor guarantors party thereto (the "**Notes Guarantors**"),[8] and BNY Trust Company of Canada and The Bank of New York Mellon, each in their capacities as indenture trustee and collateral agent (together in such capacities, the "**Indenture Trustees**"). The GT Canada Senior Secured Notes and GS USA Senior Secured Notes comprising each Unit are not separable and only are transferable in connection with the transfer of full Units.

50.     Pursuant to that certain Security Agreement dated July 24, 2012 (as amended, supplemented, or otherwise modified from time to time, the "**Senior Secured Notes Security Agreement**"), the Senior Secured Notes are secured by second-priority liens on the Prepetition Collateral.  The GS USA Senior Secured Notes are jointly and severally guaranteed in full by each of the Notes Guarantors, with the exception of the U.S. Issuer.

51.     As of the Petition Date, the aggregate principal amount outstanding under the Senior Secured Notes is approximately CDN$125 million, which amount consists of (i) approximately CDN$80 million under the GT Canada Senior Secured Notes, and (ii) approximately CDN$45 million under the GS USA Senior Secured Notes.  Interest payments of approximately CDN$6.6 million are made on account of the Senior Secured Notes on a semi-annual basis.

---

[8] Each of the ABL Guarantors is a Notes Guarantor.  However, the U.S. Issuer is not a Notes Guarantor of the GS USA Senior Secured Notes, and the Canadian Issuer is not a Notes Guarantor of the GT Canada Senior Secured Notes.

(iii)    *Intercreditor Agreement*

52.    Pursuant to that certain Intercreditor Agreement dated July 24, 2012, by and among the ABL Agent, the Indenture Trustees, and the Credit Parties (as defined in the Senior Secured Notes Security Agreement) (as amended, supplemented, or otherwise modified from time to time, the "**Intercreditor Agreement**"), the security interests in the Prepetition Collateral that secure the Senior Secured Notes and the guarantees thereof are contractually subordinated and junior to the liens that secure the ABL Credit Facility.  The restrictions on the respective parties' ability to exercise remedies against the Prepetition Collateral also are governed by the Intercreditor Agreement.  The Intercreditor Agreement provides that if any of the Credit Parties seek approval of debtor in possession financing ("**DIP Financing**") to be provided by the ABL Agent or ABL Lenders, the Indenture Trustees and holders of the Senior Secured Notes agree not to object to any use of cash collateral derived from Prepetition Collateral or any such financing, and agree not to demand any form of adequate protection in connection with such use of cash collateral derived from Prepetition Collateral or such financing except additional or replacement liens and super-priority administrative expense claims for diminution in value to the extent that the same are granted to the ABL Lenders.

(iv)    *OMERS Letter of Credit*

53.    Pursuant to that certain First Amendment to Credit Agreement (the "**First Amendment**") dated October 14, 2014, the ABL Credit Agreement was amended to increase the borrowing availability under the ABL Revolving Credit Facility from $135 million to $155 million for the period beginning February 1, 2015 and ending June 30, 2015.  As a condition to increasing the borrowing availability under the ABL Revolving Credit Facility, OCPI GT SPV Limited, a special purpose entity and an indirect subsidiary of OMERS (the "**SPV Holdco**"), entered into that certain Limited Recourse Guarantee dated October 14, 2014, pursuant to which

it agreed to guarantee all of the ABL Credit Facility Obligations (the "**SPV Holdco Guarantee**").  To secure the SPV Holdco Guarantee, Borealis Infrastructure Management Inc. ("**Borealis**"), on behalf of SPV Holdco, arranged for a standby letter of credit to be issued by the Royal Bank of Canada in the original face amount of $15 million (the "**OMERS LC**") in favor of the ABL Agent.  The purpose of the SPV Holdco Guarantee and the OMERS LC was to provide additional collateral to the ABL Lenders in exchange for an increase in available borrowings under the ABL Credit Facility.  The liability of SPV Holdco under the SPV Holdco Guarantee is limited solely to the right of the ABL Agent to draw on the OMERS LC upon the occurrence of certain events described in the ABL Credit Agreement and the SPV Holdco Guarantee.

54.     Following the First ABL Amendment, the Sponsor LC was subsequently reduced to approximately $11.5 million in connection with certain permanent repayments of the First Lien Obligations by the Company.  Prior to the Petition Date, in an effort to provide the Company with access to liquidity necessary to conduct a marketing and sale process prior to the commencement of the GSI Restructuring Proceedings, the Company and the ABL Lenders negotiated a second amendment of the ABL Credit Agreement.  Pursuant to that certain Second Amendment of Credit Agreement dated August 10, 2016 (the "**Second Amendment**"), the ABL Credit Agreement was further amended to provide that, until the earlier of (i) September 6, 2016, and (ii) the occurrence of an event of default under the ABL Credit Facility, the ABL Agent would not establish any additional or modify any existing ABL Borrowing Base Reserves or other criteria under the ABL Credit Facility that would have the effect of reducing the ABL Borrowing Base.  In connection with the Second Amendment, the OMERS LC and the SPV Holdco Guarantee were amended to increase the face amount of the OMERS LC to

approximately $16.5 million.  The Debtors have no liability under the OMERS LC, except for their obligation to pay actual out-of-pocket costs and expenses incurred by SPV Holdco as reimbursement to Borealis in connection with the issuance of the OMERS LC.

        (v)     ***Other Letters of Credit***

55.     Golfsmith has guaranteed four letters of credit: (i) one in the amount of $550,000 in connection with a U.S. workers' compensation insurance policy, (ii) one in the amount of $100,000 to secure payment of credit cards in the U.S., and (iii) two in the amounts of $674,000 and $250,000 as security for leased store space in the U.S.

        (vi)     ***General Unsecured Debt***

56.     In addition to the Prepetition Indebtedness under the ABL Credit Facility and the Senior Secured Notes, the Debtors also have significant unsecured debt, including payables owed to trade creditors and landlords.

57.     As discussed above, Golfsmith relies on a network of hundreds of vendors to supply merchandise sold through its various retail channels. As of September 12, 2016, the Debtors estimate that approximately $38 million of outstanding merchandise trade debt is due and payable, of which amount approximately $4 million is on account of goods delivered or otherwise provided to the Debtors in the 20 days immediately preceding the Petition Date.

58.     As detailed above, Golfsmith's stores are almost entirely located in their 108 leased locations.  The Debtors estimate that, as of the Petition Date, approximately $6.1 million in outstanding lease-related expenses are due and payable.

RLF1 15165431V.1

### III.

### The Need for Chapter 11 Relief and the
### Events Compelling the Commencement of the Chapter 11 Cases

59.     The Debtors have commenced these chapter 11 cases to position Golfsmith to emerge as a clear front runner in the evolving golf retail industry.  In so doing, the Debtors will use these cases to stabilize Golfsmith's operations and liquidity, right-size Golfsmith's store footprint, and pursue the Golfsmith Restructuring or a sale of Golfsmith to maximize the value for all stakeholders.

### A.    Market Conditions

60.     The annual National Golf Foundation golf participation study (the "**NGF Study**") and other recently-conducted studies[9] show that golf participation in the U.S. has stabilized and returned to growth for the first time since 2012.  In 2015, the number of golf rounds played increased by two percent, and approximately 2.2 million people took up the game, approaching the record 2.4 million who took up the game at the peak of the "Tiger Woods Phenomenon."  According to the March 2016 National Golf Rounds Played Report, golf rounds played increased by 5.5% between March 2015 and March 2016.  Additionally and, significantly, in the coming years, approximately 4 million people in the U.S. will enter into retirement.  The NGF Study projects that this increase in the number of retirees will contribute to an incremental approximately 50 million rounds of golf played each year.[10]  In 2015, the NGF Study also reported that the recent rise in golf's popularity is not exclusively attributable to

---

[9] Other sources include Golf Datatech National Golf Rounds Played Reports and Golf Digest.

[10] Based on the NGF Study, golfers aged 65 years and up play approximately 80% more rounds of golf than do golfers aged 50 to 64.

RLF1 15165431V.1

mature golfers.[11]  The emergence of exciting, young professional golfers like Rory McIlroy (age 27), Jordan Spieth (23), and Jason Day (28), coupled with an increased focus by the industry on technological innovation and enhanced experience, have started to draw more millennials and junior golfers into the game.  Notwithstanding promising signs of a strong rebound in the market, the Debtors cannot continue to operate with their current capital structure and 109 retail locations.  The Debtors commenced these chapter 11 cases to significantly reduce the burdens that inhibit Golfsmith from taking full advantage of the recent upward swing in golf's popularity.

**B.      Operational Challenges**

61.     As a result of the Debtors' aggressive expansion efforts and the market conditions detailed above, Golfsmith's financial condition is weighed down by a store footprint that is disproportionate to market demands.  Beginning in 2011, Golfsmith began to open large-format stores in excess of 30,000 square feet, which were designed to measure up to certain of its competitors operating sports "superstores."  This strategy, however, led to higher rents and occupancy costs and reduced store-level productivity.  Following the Merger, Golfsmith opened even more stores in historically successful metropolitan markets in an attempt to capture additional sales.   This strategy also was ineffective and resulted in significant sales cannibalization and increased overhead expenses.  In short, a subset of underperforming and oversized stores and above-market leases drive the Debtors' occupancy costs to overwhelming levels.

62.     In 2014, in an effort to improve margins and cash flows, the Debtors engaged A&M to help the Company embark on a series of operational improvement initiatives aimed at reducing operating expenses and conserving liquidity.  These efforts included, among

---

[11] *See also The Number of Golfers Steady, More Beginners Coming from Millennials*, Mike Statchura, Golf Digest, April 30, 2015, available *at* http://www.golfdigest.com/story/number-of-golfers-steady-more.

other things, transitioning to new a new executive management team in 2015, implementing several rounds of employee headcount reductions throughout 2014 and 2015, upgrading Golfsmith's online and in-store shopping experience with various technological improvements, and improving the Debtors' central management of working capital.

63.     Most significantly, in an effort to strategically shrink Golfsmith's underperforming store base and optimize its lease portfolio, the Debtors commenced a comprehensive review of their leases, and retained a real estate consulting firm to investigate the economics of accelerated lease buyouts and negotiate competitive lease terms with landlords. Despite the Debtors' best efforts, landlords were reluctant to negotiate concessions on generally long-term and above-market leases, and this process resulted in only one successful lease buyout.

64.     Accordingly, the Debtors have commenced these chapter 11 cases to, among other things, enable them to tactically shrink Golfsmith's store footprint by closing underperforming stores and reconfiguring its lease profile.  This will allow the Debtors to sell their businesses for the best or highest value possible and will set Golfsmith up to properly evolve and emerge from these cases as one of the most formidable competitors in the golf retail industry.

## C.     Liquidity Constraints

65.     Also contributing to Golfsmith's financial challenges are GSI's burdensome debt obligations.  GSI's capital structure has significantly limited the Debtors' ability to invest in and grow their businesses.  In recent years, GSI has implemented a number of initiatives to improve its financial condition.  Since 2014, the Company has explored various restructuring and recapitalization initiatives with certain of GSI's key stakeholders and other potentially strategic investors.  For example, in 2014, GSI negotiated the First Amendment to the ABL Credit Agreement, which temporarily increased the amount of credit available to the

27

Company under the ABL Credit Facility, increased the Prepetition Collateral by the amount of the OMERS LC, and provided Golfsmith with access to sufficient liquidity to withstand market challenges for the past two years.  Additionally, in 2015, GSI was able to obtain additional incremental liquidity during the Company's off-peak sales seasons by negotiating seasonal payment terms with some of its largest vendors.  These efforts, however, merely provided short-term solutions inadequate  to remedy Golfsmith's financial condition.

66.    Beginning in July 2016, a number of GSI's suppliers began to demand modifications in trade terms.  Certain vendors have demanded reduced payment schedules, while others have gone further and demanded that GSI pay cash in advance as a condition to the continued delivery of merchandise.  Increasingly onerous trade terms have severely limited Golfsmith's ability to purchase inventory essential to operating its stores at productive levels.  Reactions by vendors have further intensified Golfsmith's cash position, as reductions in inventory cause the ABL Borrowing Base to shrink further.

67.    Although GSI has been working diligently with its advisors to resolve these issues and avoid supply-chain interruptions, the precipitous actions taken by  vendors have further constrained the Debtors' liquidity in the weeks leading up to the commencement of these chapter 11 cases.

68.    As noted above, in an effort to maintain the stability and value of the Company pending the outcome of the prepetition portion of the Sale Process, the Company recently negotiated for concessions from the ABL Agent pursuant to the terms of the Second Amendment.  Notwithstanding the existence of events of default under the ABL Credit Agreement, the ABL Lenders agreed to continue to support the Company while it pursued alternatives for clean entry into the GSI Restructuring Proceedings.  This and the Company's

other out-of-court restructuring efforts have enabled the Debtors to operate in the ordinary course, despite their intensifying liquidity challenges.   The Debtors have commenced these chapter 11 cases to implement the Golfsmith Restructuring or complete a sale of their businesses and thereby achieve a permanent solution to their liquidity challenges and to allow Golfsmith to emerge as a competitive going concern.

D.      **Sale of the Company**

69.      Before the Debtors commenced these chapter 11 cases, GSI conducted an extensive sale process to market the Company, either through separate sales of Golfsmith and Golf Town, or through a sale of the entire Company.  GSI retained Jefferies LLC ("**Jefferies**") in June 2016 to serve as the Company's investment banker and architect and execute the sale process.  The ABL Lenders supported the Company's and Jefferies' efforts during the prepetition sale process.

70.      Beginning in June 2016, Jefferies undertook a targeted process to solicit interest in purchasing GSI's businesses.   Jefferies contacted 214 potential buyers, including 37 potential strategic buyers and 177 potential financial buyers.  Based on responses from those entities, Jefferies provided 67 potential buyers with access to a data room containing confidential information regarding GSI's businesses.  The Debtors believe that they have contacted most if not all parties in the universe of potential purchasers that may have an interest in acquiring their businesses.

71.      The Company established July 20, 2016 as the last date by which interested parties could submit non-binding indications of interest to purchase all or part of the Company's assets.   The first round of the prepetition sale process resulted in the Company receiving 12 non-binding indications of interest from potential buyers (the "**First Round**

29

**Bidders**").  Ten (10) First Round Bidders were financial bidders, and two bidders constituted consortia of financial and strategic buyers.

72.    The Company directed Jefferies to proceed with the prepetition sale process and invite seven of the First Round Bidders (the "**Second Round Bidders**") to submit final, binding bids.  Second Round Bidders were invited to the Golfsmith Campus for a round of management presentations given throughout the early part of August 2016.  The Company used the management presentations to share with the Second Round Bidders additional important confidential information about the Golfsmith and Golf Town businesses.

73.    The Company initially established August 25, 2016 as the last date by which the Second Round Bidders could submit final bids, and subsequently extended that deadline to August 29, 2016, to allow Second Round Bidders additional time to complete due diligence on the Company and finalize their binding bids.

74.    On August 29, the Company received four bids to purchase some or all of the Company's assets, which included (a) two bids to purchase Golf Town only, (b) one non-binding bid to purchase the entire Company, and (c) one non-binding bid to purchase Golfsmith.  The Company was successful in obtaining a binding bid for a going-concern sale of Golf Town prior to the commencement of these chapter 11 cases.  The Company also was successful in executing the Restructuring Support Agreement with Fairfax and CI, and on terms favorable to the Debtors.  Nonetheless, the Debtors believe that it would be beneficial to complete the Sale Process and hold an auction for the sale of their assets to determine whether the Golfsmith Restructuring or the Sale Process would yield the highest or otherwise best recoveries for their creditors.  Moreover, the ABL Lenders, who have supported the prepetition sale process and have agreed to provide the Debtors with debtor in possession financing, also want assurance that

RLF1 15165431V.1

the sale of the Prepetition Collateral will occur on a timeline that will not negatively impact the Debtors' ability to repay the currently oversecured ABL Credit Facility Obligations in the event that the Debtors are unable to refinance those obligations.  The timing of the Sale Process has been developed with the goal of preserving and realizing the value of the Debtors' assets and maximizing recoveries to the Debtors' creditors, and is driven, in large part, by the importance of closing a sale of Golfsmith prior to the start of Golfsmith's end-of-year holiday sales season.  An orderly but expeditious sale of Golfsmith is critical to both preserving and realizing Golfsmith's going-concern value and maximizing the recoveries available to the Debtors' economic stakeholders.

75.    As set forth in further detail below and in the Debtors' Sale Motion (as hereinafter defined) filed contemporaneously herewith, the Debtors have designed bidding procedures to be used in connection with an auction of substantially all of Golfsmith's assets. Based on communications between Jefferies and potential buyers interested in purchasing the Debtors' assets, the Debtors believe they will receive competitive bids for the sale of Golfsmith as a going concern.   Although the Debtors' primary goal in connection with the Sale Process is to consummate a value-maximizing going-concern sale transaction, the Debtors' proposed bidding procedures contemplate, and the Debtors will consider, consummation of one or more liquidation transactions should it become necessary.

## IV.

## First Day Motions[12]

76.    Contemporaneously with the filing of their chapter 11 petitions, the Debtors have filed the First Day Motions seeking relief that is necessary to enable the Debtors to

---

[12] Capitalized terms used but not otherwise defined in this section of the Declaration shall have the respective meanings ascribed to such terms in the relevant First Day Motions.

31

smoothly transition into these chapter 11 cases and minimize disruptions to their business operations.  I understand that Golf Town has applied for similar relief in the CCAA Proceeding. I respectfully submit that the relief requested in each First Day Motion should be granted because such relief is a critical element in stabilizing and facilitating Golfsmith's operations during the pendency of these chapter 11 cases.  A summary of the relief requested in each First Day Motion is set forth below.  I have reviewed each of the First Day Motions and confirm that all of the facts set forth therein are true and correct to the best of my knowledge and belief, based upon my personal knowledge of the of the Debtors' businesses, employees, operations, and finances; information learned from my review of relevant documents; my discussions with members of the Debtors' senior management and advisors; information provided to me by employees working under my supervision; or my opinion based upon experience, knowledge, and information concerning the Debtors' businesses.

## A.      Administrative Motions

### (i)      *Motion of Debtors for Entry of an Order Directing Joint Administration of Related Chapter 11 Cases (the "<u>Joint Administration Motion</u>")*

77.      The Debtors request entry of an order (i) directing joint administration of their chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), (ii) providing that the Court maintain one file and one docket for all of the Debtors' chapter 11 cases under the lead case, *In re Golfsmith International Holdings, Inc. et al.*

78.      There are 13 Debtors, and approximately 9,300 creditors and other parties in interest in the Debtors' chapter 11 cases.  I understand that a court may order the joint administration of multiple chapter 11 cases where debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code.  Each of the Debtors is a direct or indirect subsidiary of GSI Holdings.  Accordingly, I understand that the Debtors are "affiliates" and this Court is authorized

32

to order joint administration of their estates. Joint administration of the chapter 11 cases will allow for the efficient and convenient administration of the Debtors' interrelated chapter 11 cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

79.      The Debtors operate as an integrated business with common ownership and control. The Debtors also share a number of financial and operational systems. As a result, many of the motions and orders that will be filed and entered in the chapter 11 cases almost certainly will affect each Debtor. The entry of an order directing joint administration of the chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections and will allow all parties in interest to monitor the chapter 11 cases with greater ease and efficiency. The relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 with minimal disruption.

**(ii)** *Motion of Debtors for Entry of an Order Extending the Time to Assume or Reject Unexpired Leases of Nonresidential Real Property (the "<u>Motion to Extend the Assumption/Rejection Deadline</u>")*

80.      The Debtors request, pursuant to Bankruptcy Code section 365(d)(4), an extension of the time to assume or reject unexpired leases (the "**Unexpired Leases**") of non-residential real property (the "**Assumption/Rejection Deadline**") by an additional 90 days up to and including April 12, 2017. The Debtors request this extension of the Assumption/Rejection Deadline without prejudice to their right to seek further extensions with the consent of the affected landlords, as contemplated by section 365(d)(4)(B)(ii) of the Bankruptcy Code.

81.      The Debtors need maximum flexibility to make fully-informed decisions regarding their Unexpired Leases. Whether the Debtors will move to assume or reject certain Unexpired Leases depends on a variety of factors, including the outcome of the Store Closing

33

Sales and whether the Debtors determine that implementing the Golfsmith Restructuring or consummating a sale of substantially all of their assets will yield the highest or otherwise best recoveries for their creditors. To provide the Debtors with sufficient time to execute their restructuring strategy and to provide assurances to all interested parties, I believe that it is important for the Debtors to be in a position to signal to the open market at the outset of these cases that they will have sufficient time to make well-reasoned decisions about their Unexpired Leases.

82.    It is my understanding that, under the circumstances of these chapter 11 cases, "cause" exists to extend the Assumption/Rejection Deadline pursuant to section 365(d)(4) of the Bankruptcy Code. Accordingly, the Court should extend the Assumption/Rejection Deadline by 90 days through and including April 12, 2017, without prejudice to the Debtors' right to seek further extensions of the Assumption/Rejection Deadline should they become necessary or appropriate.

(iii)    *Application of Debtors for Authority to Retain Prime Clerk, LLC as Claims and Noticing Agent to the Debtors Nunc Pro Tunc to the Petition Date (the "Claims and Noticing Agent Retention Application")*

83.    The Debtors request authority to retain Prime Clerk, LLC ("**Prime Clerk**") as claims and noticing agent (the "**Claims and Noticing Agent**") in accordance with the terms and conditions of that certain Engagement Agreement dated July 28 2016, by and between Prime Clerk and the Debtors (the "**Engagement Agreement**"), effective *nunc pro tunc* to the Petition Date. Prime Clerk's duties will include assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in these chapter 11 cases. I believe the Debtors' selection of Prime Clerk to serve as their Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c)*. Specifically, the Debtors have solicited and reviewed

34

engagement proposals from at least two other Court-approved claims and noticing agents to ensure selection through a competitive process.

84.     I believe that Prime Clerk's rates are competitive and reasonable given Prime Clerk's quality of services and expertise.  The terms of Prime Clerk's retention are set forth in the Engagement Agreement attached as **Exhibit 1** to the proposed order granting the Claims and Noticing Agent Retention Application.  Appointing Prime Clerk as the Debtors' Claims and Noticing Agent will maximize the efficiency of the distribution of notices and the processing of claims, as well as relieve the Office of the Clerk of the Bankruptcy Court of the administrative burden of processing a large number of claims and notices.

## B.     Operational Motions Requesting Immediate Relief

(i)     *Motion of Debtors for Interim and Final Orders (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Liens and Superpriority Claims, and (IV) Granting Adequate Protection to Prepetition Secured Parties (the "DIP Motion")*

85.     To allow it to pursue its ongoing Sale Process and restructuring efforts through expedited chapter 11 cases in this Court, Golfsmith has secured postpetition financing from the ABL Lenders.  Both Golfsmith and Golf Town entities are borrowers and guarantors under the proposed $135 million senior secured superpriority revolving debtor in possession credit facility (the "**DIP Facility**").  The DIP Facility, along with the use of Cash Collateral, will provide the Company with the necessary liquidity and time to implement its restructuring strategy.

86.     The DIP Facility is provided by Antares, as agent (the "**DIP Agent**") for itself and a syndicate of lenders, and is comprised of an asset-based revolving credit facility, a letter of credit subfacility, and a swingline loan subfacility (the borrowings under each, the "**DIP Obligations**").  The DIP Facility will be secured by, among other things, a first priority lien on

35

the Prepetition Collateral (the "**DIP Liens**") and the DIP Agent will be granted various forms of adequate protection on account of their interests in the Prepetition Collateral.  Furthermore, the terms of the DIP Facility contemplate a "creeping" roll-up (the "**Roll-Up**") of the Outstanding ABL Credit Facility Obligations into the DIP Facility.

87.    The Roll-Up provides that proceeds generated by the Debtors' operations and restructuring, including from the Golf Town Transaction, the sale of all or substantially all of Golfsmith's assets (a "**Golfsmith Sale**"), and Store Closing Sales, will be applied toward the outstanding ABL Credit Facility Obligations, which will effectively "roll" the  ABL Credit Facility into the DIP Facility.

88.    The DIP Facility was procured after an extensive marketing and negotiating process lead by Jefferies and A&M.  The DIP Facility, including the Roll-Up of the Company's ABL Credit Facility Obligations, is the best available financing option for the Company for several reasons:

a.    First, the incremental availability under the DIP Facility and the milestones (the "**Milestones**") under the DIP Credit Agreement (as hereinafter defined) provide the Company with the necessary liquidity and time to complete their ongoing Sale Process, which will maximize recoveries for all creditors.

b.    Second, the terms of the DIP Facility are competitive and substantially less costly than alternative postpetition financing options, and the interest charged on the DIP Facility represents a savings over the default interest rates the Debtors could be required to pay on account of the oversecured ABL Credit Facility Obligations.

c.    Third, the Roll-Up is appropriate in these circumstances where the ABL Credit Facility Obligations are oversecured and would be paid in full at the conclusion of these chapter 11 cases. The Roll-Up merely accelerates the satisfaction of the ABL Credit Facility Obligations and converts such obligations into DIP Obligations that are less costly to the Debtors' estates without affecting the recoveries to junior creditors of the Debtors' estates.

d.    Fourth, obtaining a DIP Facility from a group comprised of the Company's ABL Lenders allows the Debtors to avoid a costly priming

dispute that could disrupt the Debtors' restructuring and sale efforts and ultimately be far more costly for all parties-in-interest in these chapter 11 cases.

e.    Fifth, it is my understanding that other parties-in-interest will not be prejudiced by the Roll-Up because there will be a period of time during which the ABL Liens will be subject to review by a creditors' committee.

89.    I believe that approval of the DIP Facility, including the Roll-Up, is in the best interests of the Debtors, their estates, and their creditors, and will provide for a steady path toward an operational restructuring and sale of the Debtors' businesses. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral, and the incurrence of new indebtedness under the DIP Facility is vital to the Debtors' ability to pursue their chapter 11 strategy.

90.    Further, the Debtors have an immediate need to enter into the DIP Facility and obtain access to the DIP Loans and use of Cash Collateral. By entering into the DIP Facility, the Debtors will be able to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general business needs (including fees, costs, and expenses related to these chapter 11 cases and the DIP Documents, capital expenditures), and repay the ABL Credit Facility Obligations.

91.    I believe that the inability to access the Cash Collateral and enter into the DIP Financing—even for a limited period of time—would immediately and likely irreparably harm the Debtors' business operations, which would be to the detriment of the Debtors' estates and their economic stakeholders. Accordingly, access to the DIP Facility and the use of Cash Collateral is critical to preserve and maintain the value of the Debtors' assets.

92.    Furthermore, the Company requires access to the DIP Facility and Cash Collateral in order to fund the GSI Restructuring Proceedings, finalize and consummate the sale

37

transactions it has been pursuing in connection with the Sale Process, and otherwise effectuate a restructuring of its operations and balance sheet. The DIP Facility and Cash Collateral provide the Company with the necessary liquidity and stability to achieve these goals.  The Company expects to obtain approximately $11.2 million in incremental available liquidity upon the closing of the DIP Facility and entry of the interim order approving use of Cash Collateral.  The Company's additional liquidity will primarily be derived from an estimated reduction of approximately $8.9 million in required ABL Borrowing Base reserves, which under the ABL Credit Facility were approximately $23.9 million and under the postpetition DIP Facility are anticipated to be approximately $15.1 million.

93.     As detailed above, prior to the commencement of these chapter 11 cases, the Company undertook a number of steps to improve its liquidity position, including negotiating amendments to the ABL Credit Agreement and securing additional collateral to increase available borrowings under the ABL Credit Facility.  Despite the efforts of the Debtors and their senior management to actively manage their capital structure to enhance liquidity, market factors have made the Debtors' leveraged capital structure untenable.  Accordingly, in the course of the last several months, the Company has explored potential transactions that could allow it to deleverage its capital structure and reorganize its businesses, or obtain financing to give it the runway to execute the sales of its businesses, and better position Golfsmith's businesses for long-term success.

94.     The Company's primary strategic consideration when considering a potential financing was the identification of an affordable source of financing that would ensure a smooth transition into chapter 11—a difficult proposition for many retail companies in the current retail environment.  Further challenging this process is that the ABL Credit Facility

Obligations are secured by substantially all of the Company's assets, such that either (i) the liens of the Prepetition Secured Parties would have to be primed to obtain postpetition financing from a third party, or (ii) the Debtors would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Secured Parties.

95.     In August 2016, the Company and its professional advisors engaged with the ABL Agent and other potential financing sources to ascertain their interest in providing DIP Financing to the Company.  The Company and its advisors contacted 13 parties, and distributed non-disclosure agreement ("**NDAs**") to five (5) parties that expressed interest.  Three (3) parties entered into NDAs for the purpose of evaluating the DIP Financing opportunity, and three (3) additional parties that had executed NDAs in connection with the prepetition sale process also discussed with Jefferies the prospect of providing DIP Financing to the Company.

96.     Other than the ABL Agent, all potential financing sources indicated that they were extremely hesitant to advance DIP Financing based on their expectation that the Prepetition Secured Parties would be unlikely to support a priming DIP Financing proposal from a third party.  Given the concerns about a potential priming fight with the ABL Agent, the terms proposed by the potential third-party sources were substantially more costly than the terms the Company could obtain from the ABL Lenders.

97.     Based on my experience, I do not believe the Prepetition Secured Parties would have granted blanket consent to be primed by another lender group or to use Cash Collateral in a priming scenario.  Fortunately, the Prepetition ABL Lenders indicated a willingness to the Debtors to offer the DIP Facility and consent to the Debtors' use of Cash Collateral in chapter 11, provided that they be granted certain protections in these chapter 11 cases.

39

98.     After arms' length and good faith negotiations, the Debtors were able to secure a commitment from the ABL Lenders (in such capacity, the "**DIP Lenders**") to provide the DIP Facility during the GSI Restructuring Proceedings, pursuant to that certain Senior Secured, Super-Priority Debtor-in-Possession Credit Agreement (the "**DIP Credit Agreement**"), along with the other agreements and documents related thereto (together with the DIP Credit Agreement, the "**DIP Documents**").  The willingness of the existing ABL Lenders to provide the DIP Facility is an indication of the strength of the Company's relationship with the ABL Lenders.

99.     The terms of the DIP Credit Agreement were negotiated extensively and at arm's length by well-represented, independent parties in good faith.  The Debtors have negotiated the best terms available to obtain the funding they need to maintain sufficient liquidity and preserve their assets over the course of their chapter 11 cases.  The terms governing the Debtors' use of Cash Collateral and the DIP Facility are consistent with the terms generally provided in other similar chapter 11 cases.

100.    In my role as the Debtors' financial advisor and CRO, I reviewed the terms of the DIP Credit Agreement to ensure that the Debtors were obtaining the type of financing that would permit the Debtors to complete their ongoing Sale Process.  Based on my experience and review of the processes used by the Debtors in the marketing and negotiation of the various financing options available, including engaging in good faith and arm's length negotiations with a number of potential lenders, I believe that the DIP Facility should be approved.  I believe the DIP Facility is fair, reasonable, in the best interests of the Debtors' estates, and will provide Golfsmith with the financing on the best terms available in the market

40

while simultaneously providing support for the Sale Process, an essential component of the Debtors' restructuring strategy.

101.     Based on my experience in general and my specific involvement with the DIP Facility in this matter, I believe that the process was full and fair, was comprehensive, and produced the best available financing option under the circumstances.  The negotiations with the DIP Lenders were conducted at arm's length and were productive, as the Company was able to improve upon the initial proposal offered by the DIP Agent.  I believe each Debtor has all requisite corporate power and authority to execute and deliver the DIP Documents and to perform its obligations thereunder.

102.     The material terms and conditions of the DIP Facility are summarized in the DIP Motion.  The terms and conditions of the Debtors' use of Cash Collateral and the DIP Facility, including the Milestones, DIP Liens, and approved DIP budget (the "**Approved Budget**") are commercially reasonable and are consistent with the terms generally provided in other similar chapter 11 cases.  The Approved Budget, which the Company developed in consultation with its advisors, is achievable and sufficient.

103.     The terms of the DIP Credit Agreement are competitive and substantially less costly than preliminary proposals discussed with third-party postpetition financing sources. Furthermore, the default interest rate under the DIP Facility is lower than the interest rates of the ABL Credit Facility being "rolled-up" into the DIP Facility.  Accordingly, the Debtors' estates will realize interest expense savings as a result of the Roll-Up  It is estimated that Company will realize $130,000 in interest savings in the seven-week DIP financing period as a result of the Roll-Up.

104.     In addition to being fairly priced, the DIP Facility obviates the need for a priming fight in the early days of these chapter 11 cases.  Rather than a dispute over priming, the Debtors enter these chapter 11 cases working collaboratively and constructively with the ABL Lenders, who have been supportive of the Company's restructuring and sale efforts.

105.     Under the DIP Credit Agreement, the proceeds of DIP Collateral that is sold in the ordinary course, sold in connection with the Golf Town Transaction, or liquidated pursuant to a Permitted Store Closing Sale or a Store Liquidation will be used to reduce the ABL Credit Facility Obligations.  Specifically, the Roll-Up is designed as a "creeping roll-up" whereby the Debtors' postpetition receipts are applied to the ABL Credit Facility Obligations, and corresponding amounts are advanced to the Company under the DIP Facility.

106.     Agreeing to the Roll-Up is supported by the sound business judgment of the Debtors, is justified in these limited circumstances, and in the best interests of the Debtors' creditors and estates.  Importantly, based on information received by the Debtors during the prepetition sale process, including the indications of interest received by the Debtors and their advisors, the Prepetition ABL Credit Facility Obligations are oversecured.  The Prepetition Secured Parties consented to the use of Cash Collateral and the priming of their prepetition liens in connection with the DIP Facility in connection with the Roll-Up and is a specific condition to their lending under the DIP Credit Agreement.

107.     Finally, I understand that the Prepetition Secured Parties will be offered replacement liens and superpriority expense claims, and the ABL Secured Parties will be granted adequate protection payments on account of any potential diminution in the value of the Prepetition Collateral arising from the DIP Facility and the Debtors' use of Cash Collateral.  The proposed adequate protection, as described in further detail in the DIP Motion, provides the

Prepetition Secured Parties with more than sufficient adequate protection to protect them from any diminution in value of their interests in the Prepetition Collateral during the pendency of these chapter 11 cases.

108.    In sum, the DIP Facility is essential to preserve the value of Golfsmith's businesses and to ensure that Golfsmith can continue operating and pursuing a value maximizing transaction without disruption during these chapter 11 cases.   Given its present financial circumstances, Golfsmith cannot obtain alternative financing that would be acceptable to the Prepetition Secured Parties.   Accordingly, I believe that the DIP Facility, including the Roll-Up, is necessary and in the best interests of Golfsmith and its stakeholders.

  (ii)  *Emergency Motion of Debtors for Approval of (I) Procedures for Store Closing Sales, and (II) the Assumption of the Liquidation Consulting Agreements (the "Store Closing Procedures Motion")*

109.    By the Store Closing Procedures Motion, the Debtors seek to implement a key component of their restructuring strategy, which is to surgically close certain unprofitable stores in connection with the Golfsmith Restructuring or a sale of substantially all of the Debtors' remaining assets.   Such closures will improve the Debtors' financial outlook and liquidity profile and will allow them to focus their efforts around a smaller footprint of profitable stores in target markets with the potential for sustainable growth.   The Debtors, with the assistance of their advisors, have identified 20 Golfsmith stores that require prompt closure (the "**Closing Stores**").   In addition to this limited store closing process, the Debtors continue to evaluate their entire lease portfolio to seek out opportunities for cost savings, including the possibility of seeking rent concessions from landlords.

110.    Prior to the Petition Date, the Debtors engaged A&M to systematically analyze each of their stores.   Many of the Debtors' stores either already are or are trending toward being sustainable profit centers, show strong sales numbers, cover important regions, are

run by talented managers, maintain sustainable cost structures, and offer the possibility for long-term positive EBITDA trends.

111.   Certain of the Debtors' other stores, however, have underperformed. Historically, these underperforming stores are, among other things, subject to above-market rent, are located in over-saturated markets, or are too large for the Debtors' and local consumers' needs.  The underperforming stores do not offer the potential for growth and their continued operation no longer remains viable.

112.   The Debtors and I believe that the Closing Stores potentially make Golfsmith less attractive to potential purchasers, and the losses at the respective store locations impact the Debtors' liquidity.  I believe that ceasing operations at the Closing Stores ultimately will allow the Debtors to maximize value for their stakeholders.  In arriving at this conclusion, the Debtors and their advisors carefully considered the impact of such store closures on the Debtors' creditors, employees, and other constituencies.  Closing the Closing Stores will immediately lower the Debtors' costs and increase cash flow from operations.

113.   In formulating the list of Closing Stores, the Debtors considered, among other factors, current occupancy costs, historical store profitability, recent and projected sales trends, the geographic market in which each store is located, the potential to realize negotiated rent reductions with the landlords of the applicable store, and other specific factors related to a store's performance.

114.   A&M determined that 13 of the Closing Stores were unprofitable in fiscal year 2015, and that each of the remaining seven Closing Stores produced flat or marginal profit in fiscal year 2015. Collectively, the 13 unprofitable Closing Stores generated approximately $3.9 million in losses for fiscal year 2015, which represents 83% of the Debtors' total losses

from stores with negative pro forma EBITDA.   The liquidation of the assets in the Closing Stores is expected to yield approximately $7.2 million in net proceeds, which the Debtors will use to repay the borrowings under the Prepetition ABL Facility pursuant to the Roll-Up and reduce their costs and expenses in these chapter 11 cases.

115.   The Debtors are seeking approval of streamlined procedures to sell the inventory, furniture, fixtures, and equipment at any store scheduled for closure during these chapter 11 cases, in each case free and clear of liens, claims, interests, and encumbrances (the "**Store Closing Procedures**"), with liens to attached to the proceeds of such sales.  The Debtors are seeking interim approval to apply the Store Closing Procedures to the Closing Stores given the significant operating losses continuing in the Closing Stores in the aggregate, the Debtors' liquidity constraints, and the budget set forth in the DIP Facility.

116.   To maximize value for their creditors, the Debtors may need to close additional stores during these cases (such stores, the "**Additional Closing Stores**").  The Debtors will seek approval of procedures to apply the Store Closing Procedures to the closing of any Additional Closing Stores at a final hearing.

117.   To run a seamless and efficient large scale store closing process and to maximize the value of the assets being sold, the Debtors also request that the Court deem as operative and effective their liquidation consulting agreement (the "**Liquidation Consulting Agreement**") with Great American Group, LLC ("**Great American**" or the "**Liquidation Consultant**").   I understand that the Debtors will seek authority to assume the Liquidation Consulting Agreement after a final hearing on the Store Closing Procedures Motion.

118.   After considering each of the bids received from liquidators to conduct the Store Closing Sales, and after further negotiations with the bidders, the Debtors determined that

45

Great American had proposed the most favorable terms and was capable of performing all required tasks associated with the Store Closing Sales. Accordingly, the Debtors and Great American entered into the Liquidation Consulting Agreement, which will govern the terms of Great American's engagement. The Debtors and the Liquidation Consultant negotiated the Liquidation Consulting Agreement at arm's length.

119. The Liquidation Consulting Agreement generally provides that the Liquidation Consultant will advise the Debtors with respect to the sale of the assets at the Closing Stores (the "**Closing Store Assets**"). Specifically, Great American will, among other things, (i) advise the Debtors on a sale strategy; (ii) retain and provide qualified supervisors to implement the Store Closing Sales; (iii) oversee the Store Closing Sales; (iv) determine and recommend the appropriate point of purchase, point of sale, and external advertising; (v) determine the appropriate pricing, display, and discounting of merchandise, as well as recommend appropriate staffing levels; (vi) determine and recommend appropriate transfers of merchandise among the Debtors' stores; (vii) determine and recommend shipping of additional merchandise into and out of the Closing Stores; (viii) sell certain FF&E (as hereinafter defined) in the Closing Stores; and (ix) provide other related services.

120. In consideration of the services to be rendered, the Debtors propose to provide the Liquidation Consultant with a fee equal to three-quarters of one percent (0.75%) of the gross proceeds from the Store Closing Sales, calculated pursuant to the method described in the Liquidation Consulting Agreement (the "**Merchandising Fee**"). The Liquidation Consultant may also sell furniture, fixtures, and equipment ("**FF&E**") in the Closing Stores at the direction of the Debtors, and will receive a commission equal to 15% of the net proceeds from all sales or other dispositions of FF&E at the Closing Stores (the "**FF&E Fee**"). In addition, the Debtors

46

will reimburse the Liquidation Consultant for certain reasonable out-of-pocket expenses incurred in connection with the sale or other disposition of the Closing Store Assets, subject to a cap.

121.    Based on my experience with liquidation consultants and liquidation consulting agreements approved in other retail chapter 11 cases, I believe the terms proposed under the Liquidation Consulting Agreement are reasonable.  I believe the Debtors' selection process ensured that the Merchandise Fee, FF&E Fee and any other fees agreed to by the Debtors are reasonable and market based.

122.    Given the number of Closing Stores that need to be simultaneously closed, only national liquidators such as Great American that have significant experience with large-scale liquidations can ensure a smooth liquidation process and maximize the value of the Closing Store Assets.  The Liquidation Consulting Agreement enables the Debtors to utilize the experience, skills, and resources of the Liquidation Consultant to effectively and efficiently conduct the Store Closing Sales and, thus, significantly improve the potential value to be received through the Store Closing Sales for the benefit of all stakeholders.  Value realized in such transactions inures to the benefit of the Debtors' estates, which will more than offset any expenses incurred by reason of the assumption of the Liquidation Consulting Agreement.  Further, the Liquidation Consultant's fees will be based on the successful sale of the Closing Store Assets.

123.    Based on my experience with other retail chapter 11 cases, I believe that implementing the Store Closing Procedures will provide the best and most efficient means for the Debtors to sell the Closing Store Assets to maximize their value for the estates (such sales, the "**Store Closing Sales**").  Pursuant to the DIP Facility, the Store Closing Sales must conclude by October 28, 2016.  I understand that the Debtors intend to market the Unexpired Leases for

the Closing Stores until that date, and, therefore, the Debtors have not yet made a determination whether to reject the Unexpired Leases for the Closing Stores.

124.    Any interruption or delay in the Debtors' ability to implement the Store Closing Procedures at the Closing Stores will have serious negative consequences for the Debtors' estates.  The Closing Stores are a significant financial drain on the Debtors' estates. The sooner the Closing Stores are closed and the Closing Store Assets are liquidated or transferred to profitable locations, the more cash the Debtors will save for the benefit of their creditors.  For these reasons, the Approved Budget assumes the prompt commencement of Store Closing Sales at the Closing Stores.  Failure to obtain interim relief for the commencement of Store Closing Sales places the Debtors at risk of being unable to meet the constraints of the Approved Budget and potentially defaulting under the terms of the DIP Credit Agreement.

125.    In addition, approval of the Store Closing Procedures and the assumption of the Liquidation Consulting Agreement is required so that the Liquidation Consultant can begin preparing for and advertising the Store Closing Sales as soon as possible, with the aim of maximizing the value of the Closing Store Assets.  Any delay in the commencement of the Store Closing Sales will cause significant liquidity shortfalls during the initial weeks of these cases. Further, the Debtors expect that the announcement of the Store Closing Sales will result in difficulty retaining employees at the Closing Stores.    In short, the longer the delay in commencing the Store Closing Sales, the more difficult it will be for the Debtors to maximize the positive results of such sales.

126.    The relief requested in the Store Closing Procedures Motion is integral to maximizing the value of the Debtors' estates and is routine in retail chapter 11 cases.

127.    To ensure maximum success of the Store Closing Sales, the Debtors seek authorization to implement a bonus program (the "**Bonus Program**") and fulfill their obligations thereunder to non-insider Bonus Program participants.   Specifically, the Debtors request authority, in their reasonable business judgment, to provide additional compensation in the form of bonuses (the "**Closing Bonuses**") to certain managers and other personnel of the Debtors' Closing Stores (the personnel at each store, a "**Closing Store Team**").   Each Closing Bonus will be a one-time flat fee based upon the seniority of the applicable Closing Store Team member; *provided that*, each such team member only is eligible for a Closing Bonus if they remain employed by the Debtors through the completion of the Closing Sale at the respective Closing Store.   The Debtors request authority to determine the amounts of each Closing Bonus; provided that the aggregate cost of the Closing Bonuses shall not exceed 0.4% of the Debtors' overall gross annual payroll and will not exceed 1.5% of the Debtors' gross annual payroll for the Closing Stores.   For the avoidance of doubt, the Debtors do not seek authority to pay any Closing Bonuses to insiders of the Debtors and do not seek authority to pay any Closing Bonuses until the conclusion of the Closing Sales pending entry of the Final Order.

128.    I believe that allowing the Closing Store Teams to earn Closing Bonuses at the Closing Stores will provide much-needed motivation for key personnel who are critical to the success of the Closing Sales. The Debtors believe that, absent the Bonus Program, the Debtors are likely to lose such key personnel at the Closing Stores at a time when the Debtors have few resources available to search for new employees, which would unnecessarily delay or frustrate the Closing Sales and hamstring the Debtors' efforts to maximize value.   On balance, the Debtors believe that the minimal costs of the Closing Bonuses far outweigh the benefits such

Closing Bonuses are likely to produce in the form of maximum productivity and cooperation during the Closing Sales, resulting in higher revenues in a shorter timeframe.

129.     During the course of the Store Closing Sales, the Debtors may determine that the costs associated with the continued storage and sale efforts respecting certain inventory and/or FF&E is likely to exceed the projected proceeds that could be realized from the sale thereof, or that certain inventory, FF&E, or other remaining Closing Store Assets may have low prospects for resale. In such event, any remaining Closing Store Assets would likely impose a financial burden on the estates, in the form of storage and removal costs, but are unlikely to provide much, if any, value in return to the estates (such remaining Closing Store Assets, the "**Remaining Property**"). To maximize the value of the Debtors' assets and to minimize unnecessary costs to the estates, the Debtors request authority to designate any property located at the Closing Stores as Remaining Property and to abandon such Remaining Property located at any of the Closing Stores once the applicable Closing Sale has terminated.  Before designating any assets as Remaining Property and/or abandoning any Remaining Property at any Closing Store, the Debtors will have determined in the exercise of their sound business judgment that such Remaining Property to be abandoned by the Debtors is either (a) burdensome to the estates because removal and storage costs for the Remaining Property are likely to exceed any net proceeds therefrom or (b) of inconsequential value and benefit to the estates.

    **(iii)**    *Motion of Debtors for Entry of Order (I)(A) Approving Bidding Procedures for the Sale of Substantially all of Debtors' Assets, (B) Scheduling an Auction for and Hearing to Approve Sale of Debtors' Assets, (C) Approving Form and Manner of Notice of Sale, Auction, and Sale Hearing, (D) Approving Assumption and Assignment Procedures, and (E) Granting Related Relief; and (II)(A) Approving Sale of Substantially All of Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Granting Related Relief (the "*__Sale Motion__*")*

    130.    The Debtors seek entry of (i) (a) an order authorizing and approving the Bidding Procedures substantially in the form attached to the Bidding Procedures Order as **Exhibit 1**, in connection with the sale or disposition (the "**__Sale__**") of substantially all of the Debtors' assets (the "**__Assets__**") or any portion thereof; (b) scheduling an auction of the Assets to be held on October 24, 2016; (c) scheduling a hearing (the "**__Sale Hearing__**") to consider approval of the Sale to be held on October 28, 2016; (d) authorizing and approving (i) notice of the Auction and Sale Hearing, substantially in the form of the Sale Notice attached to the Bidding Procedures Order as **Exhibit 2**; (ii) publication notice of the Auction and Sale Hearing in the *Wall Street Journal* or *USA Today*; (iii) the form and manner of notice to each non-Debtor counterparty (each, a "**__Counterparty__**") to an executory contract and unexpired lease (collectively, the "**__Contracts__**") of the Debtors' calculation of the Cure Costs with respect to each Contract, substantially in the form of the Assumption and Assignment Notice attached to the Bidding Procedures Order as **Exhibit 3**; and (iv) the form and manner of notice to each Counterparty of the Contracts the Debtors propose to assume and assign in connection with a Sale Transaction, substantially in the form of the Proposed Assumed Contracts Notice attached to the Bidding Procedures Order as **Exhibit 4**; (e) authorizing and approving the Debtors' proposed Assumption and Assignment Procedures; and (f) granting related relief; and (ii) entry of one or more orders, in form and substance reasonably satisfactory to the DIP Agent, authorizing and approving (a) the Sale of the Assets free and clear of all liens, claims, interests,

and encumbrances, with liens to attach to the proceeds of each such sale (except certain permitted encumbrances as determined by the Debtors and any purchaser of the Assets); (b) the assumption and assignment of the Proposed Assumed Contracts; and (c) granting related relief.

131.    As set forth in further detail above and in the Sale Motion, the need for a timely Sale Process is driven, in large part, by the importance of closing a Sale prior to the start of Golfsmith's end-of-year holiday sales season, and by the Milestones set forth in the Debtors' DIP Facility.    Accordingly, the Debtors and the DIP Lenders have agreed to the following Milestones:

      a.    on or before October 4, 2016, the Bankruptcy Court shall have entered the Bidding Procedures Order;

      b.    on or before October 24, 2016,  the Debtors shall complete the Auction;

      c.    on or before October 28, 2016, the Debtors shall have received final approval from the Bankruptcy Court for the Sale or, as a backup, a liquidation of the Assets (the "**Backup Liquidation**"); and

      d.    on or before October 31, 2016, the Debtors shall have executed all purchase agreements and all other relevant definitive documentation in connection with the Sale or Backup Liquidation.

132.    To give the Debtors the best possible shot at selling Golfsmith as a going concern, and to preserve the prospects of employment for as many of Golfsmith's employees as possible, I believe that the timely execution of this Sale Process is crucial.  Executing a going concern sale with alacrity will restore the confidence of Golfsmith's vendors.  This, in turn, will allow a reorganized Golfsmith to acquire "new generation" golf equipment and other mainstay merchandise on more relaxed trade terms leading up to and during the upcoming holiday season, allowing it to compete more effectively in a crowded market, and ultimately delivering value that a potential purchaser will pay for the Debtors' Assets.

133. If the Sale process is not executed timely, Golfsmith risks losing customers and significant revenue during one of its key selling seasons. Further, the Debtors want to complete the Sale Process prior to the holiday season so that both corporate- and store-level management can focus on executing the Company's business plan, maximizing revenues, and maintaining Golfsmith's long-standing goodwill with its customers.

134. As set forth in the Sale Motion, a strong business justification exits for the proposed Sale. An orderly but expeditious Sale of the Assets is critical to both preserving and realizing Golfsmith's going concern value and maximizing recovery for the Debtors' economic stakeholders and also is required under the express terms of the DIP Credit Agreement. The Debtors will need to both order a significant amount of new inventory for their stores in advance of the end-of-year holiday season and to start to prepare their stores to execute their holiday season strategy. Approving a Sale of the Debtors' Assets to a going -concern buyer before November will allow the Debtors' significant cash needs to be funded by a new owner. In the alternative, approving a Sale of the Debtors' businesses to a buyer focused on liquidating the Debtors' Assets will avoid the Debtors needlessly incurring the cost of acquiring additional inventory to ensure their future viability as a going concern, while allowing a purchaser to benefit from the holiday season to liquidate the purchased inventory

135. The Bidding Procedures are designed to provide for a fair, timely, and competitive sale process, consistent with the Milestones. If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or otherwise best offer for the Assets in a timely manner. Within the Bidding Procedures, the Debtors have designed Noticing Procedures with the goal of providing all parties in interest with adequate and reasonable notice of all relevant information, key dates, and deadlines related to the

Sale Process.  It is my understanding that the Bidding Procedures and the Noticing Procedures satisfy all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

136.    In connection with the Sale Process, the Debtors also request approval of their proposed Assumption and Assignment Procedures.  The Assumption and Assignment Procedures will govern the provision of notice to Counterparties regarding the Debtors' calculation of Cure Costs required to cure monetary defaults under Contracts and the list of the Debtors' Proposed Assumed Contracts included in Successful Bid(s) for the Debtors' Assets.  It is my understanding that the Assumption and Assignment Procedures satisfy all applicable requirements under the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

137.    In light of the foregoing and as set forth in detail in the Sale Motion, executing a timely Sale Process is one of the key components of the Debtors' chapter 11 strategy.  Approval of the relief requested in the Sale Motion, including the proposed timeline, is critical to the Debtors' ability to execute their strategy and maximize value for their estates and creditors.  Accordingly, I believe the Court should approve the Bidding Procedures, the Assumption and Assignment Procedures, the Noticing Procedures, the Milestones in connection with the Sale Process, and, ultimately, a Sale of the Debtors' Assets free and clear of all liens, claims, interests, and encumbrances.

**(iv)    *Motion of Debtors for (I) Interim and Final Authority to (A) Continue Existing Cash Management System, (B) Maintain Existing Business Forms and Bank Accounts, and (C) Continue Intercompany Transactions; (II) Waiver of the Requirements of Section 345(b) of the Bankruptcy Code; and (III) Related Relief (the "<u>Cash Management Motion</u>")***

138.    The Debtors request entry of interim and final orders (i) authorizing the Debtors to (a) continue their existing cash management system (with such modifications as may be necessary to reflect the Debtors' filing of these chapter 11 cases); (b) continue using their

existing Business Forms and bank accounts; and (c) continue their intercompany transactions, including Golfsmith's provision of centralized management services to Golf Town, with such intercompany transactions to be made solely with respect to the Golf Town operating companies that are "credit parties" (the "**Golf Town Credit Parties**") under the ABL Credit Facility; (ii) extending the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code; and (iii) granting related relief.  The Debtors also request authority to continue to incur and pay, honor, or allow to be deducted from the appropriate bank account the Bank Fees and Processing Obligations (each as defined in the Cash Management Motion), and authorize Wells Fargo and TD Bank (each as hereinafter defined) to continue to charge back returned items to the Debtors' bank accounts, whether such items are dated before, on, or after the Petition Date.  For the avoidance of doubt, the Debtors are requesting such relief only with respect to Golfsmith, and not Golf Town.

139.   In the ordinary course of business, Golfsmith uses an integrated cash management system to collect, concentrate, and disburse funds generated by its operations (the "**GS Cash Management System**").  Golf Town uses a separate cash management system (the "**GT Cash Management System**," and together with the GS Cash Management System, the "**Global Cash Management System**").  Golfsmith and Golf Town maintain separate cash management systems in order to, among other things, (i) achieve operational efficiency in their complex, multinational retail businesses; (ii) comply with local laws in jurisdictions in which they operate; and (iii) manage both U.S. and Canadian currency reserves and conversions. Although the GS Cash Management System and GT Cash Management System generally operate in parallel, Golfsmith and Golf Town make ordinary-course transfers between the two systems for business and operational purposes.

RLF1 15165431V.1

140.    The Global Cash Management System is similar to the cash management systems used by other major multinational enterprises but is tailored to meet the Company's specific needs as an operator of 164 retail stores across the U.S. and Canada.  The GS Cash Management System enables Golfsmith to efficiently collect and disburse cash generated by its businesses, meet its financial obligations, centrally control and monitor corporate funds and available cash, comply with the requirements of its financing agreements, pay wages to its approximately 2,300 employees, reduce administrative expenses, and efficiently monitor accurate account balances and other financial data.

141.    In the ordinary course of business, Golfsmith entities maintain business relationships among the Debtor entities, as well as with the Golf Town Credit Parties, which is typical for a multinational retailer of this type.  The resulting intercompany transactions (the "**Intercompany Transactions**") between the Debtors or between the Debtors and the Golf Town Credit Parties create intercompany receivables and payables (collectively, the "**Intercompany Claims**").  As is typical for corporate entities of this complexity and type, Intercompany Claims are not settled by actual transfers of cash.  The Company tracks all Intercompany Transactions electronically in its accounting system, which transactions concurrently are recorded on the applicable entities' balance sheets.  The Company maintains records of all Intercompany Transactions processed through the Global Cash Management System and is able to ascertain, trace, and account for all Intercompany Transactions, including all Intercompany Claims held by and against the Golf Town Credit Parties.

142.    For all shared expenses, Golfsmith and Golf Town use an allocation methodology to transfer the expenses to the appropriate entities, with a corresponding intercompany payable and intercompany receivable attributed to the applicable entities.

143.    To ensure each individual Debtor will not disadvantage its creditors by funding the operations of another entity, the Debtors request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, the Court grant administrative expense status to all postpetition Intercompany Claims. If postpetition Intercompany Claims are accorded administrative expense status, each entity using funds that flow through the Global Cash Management System will continue to bear the ultimate responsibility for its ordinary-course transactions with affiliates.

144.    The Debtors also seek authorization to continue using their existing bank accounts. Strictly enforcing the UST Guidelines and requiring the Debtors to open all new bank accounts during this early and very critical phase of their chapter 11 cases would severely disrupt the Debtors' ordinary financial and business operations and cause the Debtors to incur unnecessary costs at the expense of their creditors. If this relief were not granted, the Debtors' Finance Department would need to focus its efforts on immediately opening new bank accounts and working to re-establish proper cash flow controls, a process which would divert the attention of vital personnel away from their daily responsibilities during this critical transitional time.

145.    In connection with their request to maintain their existing bank accounts, the Debtors also request that the Court authorize and direct their banks to continue to treat, service, and administer their bank accounts as accounts of the Debtors, as debtors in possession, without interruption, and in the usual and ordinary course, and to receive, process, honor, and pay all checks, drafts, wires, or automated clearing house payments drawn on the bank accounts after the Petition Date; *provided*, that any payments issued or made prior to the Petition Date will not be honored absent direction of the Debtors and an order of the Court.

146.    Additionally, the Debtors request that they be permitted to continue paying periodic service charges and other fees assessed by their banks and payment processors in connection with the maintenance of the GS Cash Management System (collectively, the "**Bank Fees and Processing Obligations**").  Payment of any prepetition Bank Fees and Processing Obligations is in the best interests of the Debtors and all parties in interest, as it will prevent unnecessary disruptions to the GS Cash Management System and ensure that the Debtors' receipt of funds is not delayed.  Further, because the banks and payment processors likely have setoff rights for the Bank Fees and Processing Obligations, payment of these prepetition obligations should not alter the rights of unsecured creditors in these chapter 11 cases.

147.    Also to minimize costs incurred on account of the commencement of these chapter 11 cases, the Debtors seek authorization to continue using all of their Business Forms and checks substantially in the forms used immediately prior to the Petition Date, without reference to the Debtors' status as debtors in possession.  In the event that the Debtors generate new Business Forms and/or checks during the pendency of these cases, such business forms and checks will include a legend referring to the Debtors as "Debtors-In-Possession."

148.    The Debtors also seek a 30-day extension of the time to comply with the requirements under section 345(b) of the Bankruptcy Code to the extent that they are not already in compliance, without prejudice to the Debtors' ability to seek a further extension or final waiver of those requirements.  During the extension period, the Debtors propose to engage the U.S. Trustee in discussions to determine what modifications to their investment guidelines, if any, would be appropriate under the circumstances.

149.    Maintenance of the GS Cash Management System is critical to the Debtors' ongoing operations and the successful execution of a going-concern sale of the

Debtors' businesses.  Modifications of and disruptions to the cash management system likely would cause large-scale payment delays, impede the Debtors' ability to efficiently track the flow of funds and obtain important financial information, frustrate employees and vendors, and cause severe and irreparable disruptions to the Debtors' businesses.  Ultimately, these outcomes would cause a diminution in the value of the Debtors' estates, which would have a negative impact on all parties in interest.

     **(v)**     ***Motion of Debtors for Interim and Final Authority to (I) Pay Certain Prepetition Wages and Reimbursable Employee Expenses, (II) Pay and Honor Employee Medical and Other Benefits, (III) Continue Employee Benefits Programs, and for Related Relief (the "<u>Wages and Benefits Motion</u>")***

     150.    The Debtors request authority, but not direction, to maintain and continue to honor and pay all amounts arising from the Debtors' business practices, programs, and policies for their employees that were in effect as of the Petition Date, and as may be modified or supplemented from time to time in the ordinary course of business, relating to, among other things: (a) Unpaid Compensation, Deductions and Payroll Taxes; (b) Reimbursable Expenses; (c) Employee Benefit Programs; (d) the Severance Program; (e) the 401(k) Savings Plan (collectively, the "**Employee Obligations**"); and (f) pay the Debtors' Supplemental Workforce for their services.  The relief requested includes compensation for the Debtors' full-time and part-time employees (collectively, the "**Employees**").  As of the date hereof, certain prepetition obligations to such employees may be due and owing.

     151.    The majority of the Debtors' Employees rely on the Debtors' compensation, benefits, and reimbursement of expenses to satisfy daily living expenses.  The Debtors' Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their Employee Obligations.  Absent the relief requested in the Wages and Benefits Motion, morale and loyalty will sink to crippling lows for the Debtors' businesses,

including a wave of Employees potentially seeking alternative employment opportunities—and perhaps with the Debtors' competitors—at the same critical phase of these chapter 11 cases. This outcome almost certainly would adversely affect the Debtors' operations and their ability to adequately serve customers during a time of perceived uncertainty. The distraction caused by the loss of valuable Employees could prevent the Debtors from focusing on revamping their operations and dedicating the necessary attention and resources to administering these cases.

      **(vi)**    ***Motion of Debtors for Interim and Final Authority to Continue Their Insurance Programs and Pay All Obligations with Respect Thereto (the "__Insurance Motion__")***

152.    The Debtors seek entry of an order (i) authorizing the Debtors to continue their insurance programs (the "**Insurance Programs**") in accordance with their existing insurance policies and to perform and honor their obligations with respect thereto; (ii) modifying the automatic stay to the extent necessary to permit the Debtors' Employees to proceed with any claims they may have under the workers' compensation and employer liability program (the "**Workers' Compensation Program**"); and (iii) granting related relief. In furtherance of the foregoing, the Debtors request that they also be permitted to increase their insurance coverage if they determine, in their reasonable business judgment, that an increase is necessary.

153.    The Debtors maintain various liability, property, and other insurance policies, which provide the Debtors with insurance coverage related to, among other things, workers' compensation and employer liability, automobile liability, property damage, director and officer liability and indemnification, general commercial liability, marine cargo, excess liabilities, and terrorism (collectively, the "**Insurance Policies**").

154.    Integro Insurance Brokers of Canada ("**Integro**") is the Company's insurance broker for the Insurance Programs. In this capacity, Integro reviews insurance policies and advises the Company with respect to the procurement and maintenance of their Insurance

Programs.  The Company pays Integro an annual service fee of CAD $85,000 (approximately $65,450 USD).  Integro also facilitates the Debtors' premium finance program.

155.    The Debtors finance a majority of the premiums under their Insurance Policies pursuant to a financing arrangement with First Insurance Funding ("**First Insurance**"), which is facilitated by Integro.  At the beginning of the coverage period for each Insurance Policy, the Debtors pay Integro a down payment and the remainder of the financed premium from First Insurance. Integro then remits the full premium payment to the appropriate Insurance Carrier.  The Debtors directly pay First Insurance the financed premium amounts in monthly installments, with interest accruing at a rate of 3.06% annually.

156.    The laws of each of the states in which the Debtors operate require the Debtors to maintain the Workers' Compensation Program.  Claims under the Workers' Compensation Program are administered and paid by third-party insurer, Sentry Insurance A Mutual Company ("**Sentry Insurance**").  The Debtors subsequently reimburse Sentry Insurance on a monthly basis, subject to the deductible of $250,000 per occurrence and an aggregate limit of approximately $2.5 million per year.  The Debtors pay Sentry Insurance an annual premium in addition to reimbursement for reasonable expenses incurred in connection with the Workers' Compensation Program.

157.    Golfsmith and Golf Town entities are insured under several of the same Insurance Programs.  Although Debtor Golfsmith International, L.P. ("**GS International**") remits payments in connection with the Insurance Programs on behalf of all Golfsmith and Golf Town entities, each entity's respective allocation of applicable insurance expenses is recorded in the Company's accounting systems as an intercompany payable owed by the respective entity and an intercompany receivable due to GS International.  As explained in the Cash Management

Motion with respect to Intercompany Claims, the Global Cash Management System is set up to ensure that each GSI entity is responsible only for its own allocation of insurance expenses, and that the Debtors do not ultimately bear the expense for insurance expenses allocable to their non-Debtor affiliates.

158.    I believe that maintaining the Insurance Programs is essential to preserving the value of the Debtors' businesses, and, in with respect to certain types of liabilities, is required by law.  If any of the Debtors' Insurance Programs or Insurance Policies terminate or lapse, the Debtors could be exposed to substantial liability, which exposure would be to the detriment of all parties in interest.  Accordingly, the Debtors seek authority to pay all insurance-related obligations and request that the Court modify the automatic stay under Bankruptcy Code section 362(a) with respect to claims arising under the Workers' Compensation Program.  The relief requested in the Insurance Motion is essential to the Debtors' ability to operate their businesses, maintain their workforce, and serve their customers during the pendency of these chapter 11 cases.

**(vii)**    ***Motion of Debtors for Interim and Final Authority to Pay Certain Prepetition Taxes and Fees ("<u>Taxes and Fees Motion</u>")***

159.    The Debtors request authorization, but not direction, to remit and pay sales taxes, use taxes, state and local income taxes, property taxes, and certain other taxes, assessments, fees, and charges (collectively, the "**<u>Taxes</u>**") in the ordinary course of business. The Debtors collect, withhold, or incur an assortment of Taxes that they remit to various state and local taxing, licensing, regulatory, and other governmental authorities (collectively, the "**<u>Taxing Authorities</u>**").  Many of the Taxes collected are held in trust for and must be turned over to the Taxing Authorities.  The Debtors also seek to pay certain prepetition Taxes to, among other things, forestall Taxing Authorities from taking actions that could interfere with the

administration of these chapter 11 cases. Such actions could include asserting liens on the Debtors' property, assessing penalties and/or significant interest on past-due taxes, and commencing personal liability actions against directors, officers, and other of the Debtors' key Employees. In addition, the non-payment of such Taxes may give rise to priority claims pursuant to section 507(a)(8) of the Bankruptcy Code. Accordingly, I believe that the relief requested in the Taxes and Fees Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to continue operating their businesses in the ordinary course of business during and after their transition into chapter 11.

    **(viii)**    *Motion of Debtors for Interim and Final Authority to (I) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices, and (II) Pay and Honor Related Prepetition Obligations (the "<u>Customer Programs Motion</u>")*

    160.    The Debtors request authority to, in the ordinary course of business and consistent with past practice, (i) maintain and administer prepetition customer programs, promotions, and practices, and (ii) pay and otherwise honor their obligations to customers relating thereto, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtors' business judgment.

    161.    The Debtors' businesses depend upon the loyalty of their customers. To maximize customer loyalty, the Debtors have implemented and followed, in the ordinary course of business, various practices and programs (collectively, the "**<u>Customer Programs</u>**") to reward and provide incentives to existing customers and to attract new customers to the Debtors' stores. Such programs are standard in the sporting goods retail industry. Without the ability to continue their Customer Programs and satisfy prepetition obligations in connection therewith, the Debtors risk losing valuable market share.

162.    The Debtors maintain a program by which their customers can purchase physical or electronic, pre-paid, non-expiring gift cards in various denominations from $10 to $1,000 for physical gift cards and $1 to $500 for e-gift cards (the "**Gift Cards**"), which may be redeemed for merchandise at Golfsmith's stores, website, over the phone (the "**Gift Card Program**").  The Debtors contract with certain third-party administrators to track sales and usage of Gift Cards, and provide customer service in respect of the Gift Card Program. The Debtors also contract with various gift card distributors and loyalty marketing companies that arrange for the Gift Cards to be sold directly to customers through third-party retail locations and e-commerce platforms.  Failure to honor the Gift Cards would have a disastrous effect on the Debtors' customer relationships.  Through the Customer Programs Motion, the Debtors seek authorization to maintain the Gift Card Program and to honor all Gift Cards issued prior to the Petition Date.  In connection with the Gift Card Program, the Debtors are also seeking authority to continue to pay the Gift Card Fees, and to allow the Distributors to offset the Distribution Fees against amounts remitted to the Debtors, in each case, in the ordinary course of business, and whether arising before or after the Petition Date.

163.    Consistent with industry practice and to accommodate customers' needs, the Debtors maintain refund, return, exchange, and price adjustment policies with respect to in-store, online, and catalog purchases (collectively, the "**Return and Exchange Policies**"). To maintain the Debtors' reputation for reliability and the loyalty, goodwill, and support of their customers, the Debtors must maintain their Return and Exchange Policies. The preservation of customer loyalty generated by the Return and Exchange Policies outweighs the associated costs. As a result, the Debtors seek authorization to continue to honor the Return and Exchange

RLF1 15165431V.1

Policies in the ordinary course of business, with respect to merchandise purchased prior to and after the Petition Date.

164.    In the ordinary course of business, the Debtors conduct sales promotions, either online or at selected stores (the "**Sales Promotions**").  The Sale Promotions include "buy one, get one free" programs, coupons, mail-in rebates, seasonal discounts, competitor price matching, online promotion and discount codes, free shipping when customers purchase a certain amount of merchandise, a program that allows customers to trade in used golf clubs in exchange for store credit, as well as a loyalty membership program that gives customers access to certain complimentary golf club maintenance services, special discounts, and bonuses on the trade-in value of equipment. The Debtors request authority to make payments in respect of prepetition Sales Promotions, and otherwise to continue to honor the terms of the Sales Promotions during their chapter 11 cases.

165.    The Debtors partner with a third-party vendor (the "**Warranty Provider**") to offer customers a warranty program (the "**Warranty Program**").  For select products, customers may purchase a warranty from the Debtors that covers repair or replacement costs if products purchased at Golfsmith stores are damaged.  The Debtors collect the purchase payment for the warranty, and remit such payment to the Warranty Provider, less fees charged by the Debtors (such remitted payments, the "**Warranty Fees**").  The Debtors believe that their ability to continue to offer and honor the Warranty Program is critical to the maintenance of customer relationships.  Accordingly, the Debtors seek authorization to continue to, in their discretion, offer and honor their obligations in connection with the Warranty Program, including the payment of the Warranty Fees for warranties purchased after the Petition Date.

RLF1 15165431V.1

166.    In the ordinary course of business, the Debtors sell certain custom-made products and require that customers put down deposits ("**Purchase Deposits**") in connection with the purchase of such products.  If Golfsmith's customers fail to receive assurance that their Purchase Deposits will be honored and applied to the purchase price of applicable custom-made products, customers could seek to cancel their orders, demand the return of Purchase Deposits, and be driven to purchase merchandise from Golfsmith's competitors.  Accordingly, to maintain the Debtors' revenue stream from its custom-made products, the Debtors request authority to maintain, apply, return, and honor prepetition customer Purchase Deposits in the ordinary course of business, consistent with past practices.

167.    The relief sought in the Customer Programs Motion is absolutely essential to maximizing value for the Debtors' estates and their economic stakeholders.  As stated, the success of the Debtors' businesses depends in large part to their ability to maintain goodwill and customer loyalty.  Accordingly, authorizing the Debtors to continue maintaining their Customer Programs and honoring all obligations related thereto is in the best interests of the Debtors' estates and will inure to the benefit of all parties in interest.

**(ix)**    ***Motion of Debtors for Interim and Final Authority to Pay Prepetition Claims of Shippers and Miscellaneous Lien Claimants (the "Shippers and Lienholders Motion")***

168.    The Debtors seek an order authorizing them to pay prepetition claims of Shippers and Miscellaneous Lien Claimants.

169.    As set forth above, the Debtors operate 109 Golfsmith stores in the U.S. (the "**Stores**") and one distribution center on the Golfsmith Campus (the "**Distribution Center**").  To successfully operate their businesses, the Debtors must ensure that the Stores and the Distribution Center are replenished with a continuous supply of goods to be sold in the Debtors' stores and on Golfsmith website (the "**Merchandise**").  The Debtors' Merchandise is

66

delivered to the Distribution Center either by their suppliers or, to a lesser extent, third-party shippers (collectively, the "**Shippers**").  After being stored at the Distribution Center for a short period of time, the Merchandise is transported by Shippers either to the Debtors' Stores or directly to the Debtors' customers to fulfill online and catalog purchase orders.  The Debtors also employ a third-party vendor (the "**Shipping Administrator**") to administer the Debtors' payments to certain of the Shippers and audit corresponding invoices.  In the event that the Debtors fail to reimburse the Shippers for charges incurred in connection with the transport of the Merchandise, various state laws may permit the Shippers to assert a statutory lien against the Merchandise in their possession, potentially blocking the Debtors' access to the stored or shipped Merchandise.

170.    Maintaining access to the Merchandise is essential to the continued viability of the Debtors' retail operations.  The Debtors seek authority to pay prepetition amounts related to the shipping, logistics, and other services provided to the Debtors by the Shippers and Shipping Administrator (collectively, the "**Shipping Charges**").  In their sole discretion, the Debtors intend to undertake appropriate efforts to cause Shippers to acknowledge in writing that payment of their respective claims is conditioned upon such Shippers continuing to supply services to the Debtors on trade terms that such Shippers have provided on a historical basis.

171.    The Debtors regularly make improvements and repairs to their property, including the furniture, fixtures, and equipment located in the Stores and the Distribution Center.  To do so, the Debtors contract with numerous third parties, (collectively, the "**Miscellaneous Lien Claimants**" and, together with the Shippers, the "**Lien Claimants**").  The Miscellaneous Lien Claimants potentially could assert liens, including mechanic's liens, artisan's liens, and materialman's liens (the "**Miscellaneous Lien Claims**") against the Debtors' property for

67

amounts the Debtors owe to those third parties.   If the Debtors are unable to pay the

Miscellaneous Lien Claims, the Debtors risk losing access to property that is critical to the

continued operation of the Stores and Distribution Center.   Accordingly, the Debtors seek

authority to pay and discharge, on a case-by-case basis, Miscellaneous Lien Claims that the

Debtors believe have created, or could give rise to, a lien against the Debtors' property or

equipment, regardless of whether such Miscellaneous Lien Claimants have already perfected

> **(x)**    ***Motion of Debtors to (I) Approve Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies, (II) Establish Procedures for Resolving Objections by Utility Companies, and (III) Prohibit Utility Companies from Altering, Refusing, or Discontinuing Service (the "*Utilities Motion*")***

172.    The Debtors request entry of interim and final orders (i) approving the

Debtors' proposed form of adequate assurance of payment for postpetition telecommunications,

satellite, waste disposal, water, gas, electricity, and other utility services (the "**Utility Services**");

(ii) establishing procedures for resolving objections by the Debtors' utility companies (the

"**Utility Companies**") relating to the adequacy of the proposed adequate assurance; and

(iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or

discriminating against, the Debtors on the basis of the commencement of these chapter 11 cases

or that a debt owed by the Debtors for Utility Services rendered before the Petition Date was not

paid when due.

173.    Uninterrupted Utility Services are essential to the Debtors' ongoing

operations (including the safety and security of its personnel).   Should any Utility Company

alter, refuse, or discontinue service—even if only briefly—the Debtors' operations could be

severely disrupted.   The Debtors' operations require complex coordination of inventory

shipments and movement among stores.   Interruption of the Utility Services provided at any of

their locations would disrupt necessary communication and coordination between the Debtors'

employees, vendors, and various regulatory authorities, and could result in store closings and the loss of revenues.

174.    The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner.  The Debtors expect that cash flows from operations, together with proceeds available under the DIP Facility, will be sufficient to pay postpetition obligations related to their Utility Services in the ordinary course of business.

175.    Nevertheless, to provide the Utility Companies with adequate assurance pursuant to section 366 of the Bankruptcy Code, the Debtors propose to deposit cash in an amount equal to two (2) weeks' payment for Utility Services, calculated using the historical average for such payments during the past twelve (12) months (the "**Adequate Assurance Deposit**") into a newly-created segregated account for the benefit of the Utility Companies (the "**Utility Deposit Account**")

176.    I believe that the Adequate Assurance Deposit, in conjunction with the DIP Financing, cash flow from operations, and cash on hand demonstrates the Debtors' ability to pay for future utility services in the ordinary course of business and constitutes sufficient adequate assurance to the Utility Providers.

## Conclusion

177.    This Declaration describes the factors that have precipitated the commencement of the Debtors' chapter 11 cases and demonstrates the critical need for the Debtors to obtain the relief sought in the First Day Motions.

178.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: September 14, 2016
      Austin, Texas

                        */s/ Brian E. Cejka*_____

                        Name:  Brian E. Cejka
                        Title:   Chief Restructuring Officer
                                    Golfsmith International Holdings, Inc.

**Exhibit A**

**Organization Structure Chart**

# Corporate Organizational Chart



**Exhibit B**

**Restructuring Support Agreement**

## SUPPORT AGREEMENT

**WHEREAS**, this support agreement (the "**Support Agreement**"), dated as of September 13, 2016, sets out the agreement between Golfsmith International Holdings, Inc. ("**Golfsmith Holdings**" or the "**Company**", together with its direct and indirect wholly-owned subsidiaries and Golf Town USA LLC, "**Golfsmith**") and each of the other signatories hereto (each a "**Supporting Noteholder**" and collectively the "**Supporting Noteholders**"), whether as an original signatory or by executing a consent agreement in the form of Schedule C (a "**Consent Agreement**"), being a holder (a "**Noteholder**") of 10.50% Senior Second Lien Notes due 2018 (the "**Second Lien Notes**") (which Second Lien Notes are issued in the form of "**Units**" with each Unit consisting of $0.36 in principal amount of Second Lien Notes issued by Golfsmith Holdings and $0.64 in principal amount of Second Lien Notes issued by Golf Town Canada Inc.), regarding the principal aspects of a restructuring and recapitalization transaction (the "**Restructuring Transaction**") under which it is contemplated that the Second Lien Notes will be exchanged for (i) new 10.50% Second Lien Notes (the "**New Second Lien Notes**") issued by Restructured Golfsmith in an aggregate amount of US$35 million (a reduction of approximately US$60 million in the principal amount of the Second Lien Notes) due three years from the Effective Date and (ii) equity in Restructured Golfsmith, all as more fully described herein and on Schedule B hereto (with the terms of the Restructuring Transaction set out herein and on the Schedules hereto being, collectively, the "**Restructuring Transaction Terms**"), which Restructuring Transaction Terms shall form the basis for the terms of, be set forth in, and be implemented pursuant to, a restructuring plan (the "**Plan**") to be filed in respect of Golfsmith in proceedings (the "**U.S. Proceedings**") commenced before the United States Bankruptcy Court for the District of Delaware (the **"U.S. Court"**) under title 11, chapter 11 of the United States Code (the "**U.S. Code**") and such other approvals as may be warranted in proceedings in respect of Golf Town commenced before the Ontario Superior Court of Justice [Commercial List] (the "**Canadian Court**") under the *Companies' Creditors Arrangement Act* (the "**Canadian Proceedings**").

**AND WHEREAS**, capitalized terms used but not otherwise defined in the main body of this Support Agreement have the meanings given to them in Schedule A.

**NOW THEREFORE**, the Company and the Supporting Noteholders (each a "**Party**" and collectively, the "**Parties**") hereby agree as follows:

1. **Restructuring Transaction**

   The material terms of the Restructuring Transaction are as follows:

   (a)   a restructured Golfsmith or a newly incorporated company (such restructured Golfsmith or newly incorporated company being "**Restructured Golfsmith**") will operate the Golfsmith business following consummation of the Restructuring Transaction, which Golfsmith business will be as restructured and recapitalized as contemplated herein and substantially as contemplated in the restructuring plan presented to the Advisors;

   (b)   the Golf Town Transaction;

(c)     in exchange for the full and final settlement of all obligations owed to the Second Lien Noteholders under the Second Lien Notes and the Second Lien Notes Indenture, as applicable, including, without limitation, all guarantee obligations of Golf Town or Golfsmith in respect thereof (collectively, the "**Second Lien Notes Obligations**"), the Second Lien Notes shall be exchanged for the New Second Lien Notes and 100% of the common shares of Restructured Golfsmith (the "**Restructured Golfsmith Shares**"), provided that on agreement of the Supporting Noteholders and Golfsmith, some portion of the Restructured Golfsmith Shares may be available to unsecured creditors;

(d)     Golfsmith shall enter into the Transition Services Agreement with New Golf Town on terms consistent with the Golf Town APA (defined below);

(e)     the existing security granted in respect of the Second Lien Notes will be amended, amended and restated or otherwise addressed so that it secures all of the obligations of Restructured Golfsmith under the New Second Lien Notes, provided that to the extent it is necessary to provide new security to replace the existing security, the new security shall have the same priority as the priority resulting from the existing lien registrations and charges in respect of the Second Lien Notes;

(f)     the Second Lien Notes and the Second Lien Notes Indenture shall be cancelled and all Second Lien Notes Obligations shall be fully and finally released and extinguished;

(g)     the First Lien Credit Facility will be refinanced with a new first-lien asset-based revolving facility for Restructured Golfsmith on terms acceptable to Golfsmith and the Supporting Noteholders, acting reasonably (the "**New Credit Facility**"), which New Credit Facility will be secured by liens on all of the assets of Restructured Golfsmith in priority to liens securing the New Second Lien Notes; and

(h)     holders of the existing common shares in the capital of Golfsmith will receive no distribution under the Plan.

**2.      Representations and Warranties of the Supporting Noteholders**

Each Supporting Noteholder hereby represents and warrants to the Company (and acknowledges that the Company is relying upon such representations and warranties) that as of the date hereof:

(a)     it is, as at the date of this Support Agreement (or in the case of a Consent Agreement, the date of the Consent Agreement), the sole legal and beneficial holder of (or has sole voting and investment discretion, including discretionary authority to manage or administer funds, or investment management authority with respect to) Second Lien Notes in the principal amount(s) set forth on its signature page to this Support Agreement (or on its signature page to the Consent Agreement, as applicable) (collectively, the "**Relevant Notes**", the Relevant

Notes, together with all obligations owing in respect of the Relevant Notes, including accrued and unpaid interest and any other amount that the Supporting Noteholder is entitled to claim in respect of the Relevant Notes pursuant to the Second Lien Notes Indenture or otherwise, its "**Debt**") and no other Second Lien Notes;

(b)     it has the sole authority to vote or direct the voting of its Debt and Relevant Notes;

(c)     it (i) is a sophisticated party with sufficient knowledge and experience to evaluate properly the terms and conditions of this Support Agreement; (ii) has conducted its own analysis and made its own decision to enter into this Support Agreement; (iii) has obtained such independent advice in this regard as it deemed appropriate; and (iv) has not relied in such analysis or decision on any person other than its own independent advisors;

(d)     this Support Agreement has been duly authorized, executed and delivered by it, and, assuming the due authorization, execution and delivery by the other Parties, this Support Agreement constitutes the legal, valid and binding obligation of such Supporting Noteholder, enforceable in accordance with its terms, subject to laws of general application and bankruptcy, insolvency and other similar laws affecting creditors' rights generally and general principles of equity;

(e)     it is duly organized and validly existing under the laws of the jurisdiction of its organization and has all necessary power and authority to execute and deliver this Support Agreement and to perform its obligations hereunder;

(f)     the execution and delivery of this Support Agreement by it and the completion by it of the transactions contemplated herein do not and will not, to the best of its knowledge, violate or conflict with any judgment, order, notice, decree, statute, law, ordinance, rule or regulation applicable to the Supporting Noteholder or any of its properties or assets or result (with or without notice or the passage of time) in a violation, conflict or breach of, or constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, bylaws or other constituent documents;

(g)     except as contemplated by this Support Agreement, it has not deposited any of its Relevant Notes or Debt into a voting trust, or granted (or permitted to be granted) any proxies or powers of attorney or attorney in fact, or entered into a voting agreement, understanding or arrangement, with respect to the voting of its Relevant Notes or Debt where such trust, grant, agreement, understanding or arrangement would in any manner restrict the ability of the Supporting Noteholder to comply with its obligations under this Support Agreement, including the obligations in Section 4, or the ability of any Supporting Noteholder to exercise all ownership rights thereto;

3

(h)     the Debt held by it is not subject to any liens, charges, encumbrances or other similar restrictions that would reasonably be expected to adversely affect its ability to perform its obligations under this Support Agreement; and

(i)     to the best of its knowledge, there is no proceeding, claim or investigation pending before any Governmental Entity, or threatened against the Supporting Noteholder or any of its properties that, individually or in the aggregate, could reasonably be expected to have a material adverse effect on the Supporting Noteholder's ability to execute and deliver this Support Agreement, to perform its obligations hereunder and to consummate the Restructuring Transaction.

**3.     The Company's Representations and Warranties**

The Company hereby represents and warrants to each Supporting Noteholder (and the Company acknowledges that the Supporting Noteholders are relying upon such representations and warranties) that as of the date hereof:

(a)     this Support Agreement has been duly authorized, executed and delivered by it, and, assuming the due authorization, execution and delivery by all Parties, this Support Agreement constitutes a legal, valid and binding obligation of it, enforceable in accordance with its terms, subject to laws of general application and bankruptcy, insolvency and other similar laws affecting creditors' rights generally and general principles of equity;

(b)     it is duly organized and validly existing under the laws of the jurisdiction of its incorporation and has all necessary power and authority to execute and deliver this Support Agreement resulting from its acceptance hereof and to perform its obligations hereunder;

(c)     the execution and delivery of this Support Agreement by it and the completion by it of the transactions contemplated herein do not and will not, to the best of its knowledge, violate or conflict with any judgment, order, notice, decree, statute, law, ordinance, rule or regulation applicable to such Company or any of its properties or assets or result (with or without notice or the passage of time) in a violation, conflict or breach of, or constitute a default under, or require any consent to be obtained under its certificate of incorporation, articles, bylaws or other constituent documents;

(d)     there is no proceeding, claim or investigation pending before any Governmental Entity, or threatened against it or any of its properties that, individually or in the aggregate, would reasonably be expected to have a material adverse effect on its ability to execute and deliver this Support Agreement, to perform its obligations hereunder and to consummate the Restructuring Transaction; and

(e)     it is conducting its business in substantial compliance with all applicable Laws.

**4.**  **Supporting Noteholder Covenants**

Subject to, and in consideration of, the matters set forth in Section 5 below, each of the Supporting Noteholders hereby covenants and agrees:

(a)  to the Restructuring Transaction Terms;

(b)  not to, directly or indirectly, from the date hereof to the date this Support Agreement is terminated:

  (i)  sell, assign, lend, pledge, hypothecate, dispose or otherwise transfer (in each case, "**Transfer**") any of its Relevant Notes or Debt or any rights or interests therein (or permit any of the foregoing with respect to any of its Relevant Notes or Debt) or enter into any agreement, arrangement or understanding in connection therewith (a) while the asset purchase agreement in respect of the Golf Town Transaction (the "**Golf Town APA**") is in full force and effect in accordance with its terms, or (b) if the Golf Town Transaction has been completed, for a period of 3 months following such completion (unless the Restructuring Transaction has been completed with no restrictions therein) (clause (a) and (b) being the "**Relevant Period**"); provided that a Supporting Noteholder may Transfer any of its Relevant Notes or Debt to its affiliates at any time after the date hereof provided that such affiliates execute a joinder to this Support Agreement and, following the Relevant Period, the Supporting Noteholder may thereafter Transfer Relevant Notes and/or Debt to (a) another fund managed by the Supporting Noteholder so long as the Supporting Noteholder retains sole voting power and investment discretion over such Relevant Notes and/or Debt, (b) any other Supporting Noteholder, or (c) any other Person, provided each case such person agrees to be bound by the terms of this Support Agreement with respect to the transferred Relevant Notes and/or Debt and, contemporaneously with the Transfer, delivers an executed Consent Agreement. Each Supporting Noteholder hereby agrees to provide the Company with written notice and a fully executed copy of the Consent Agreement within three (3) Business Days following any Transfer to a transferee described in this Section 4(b).  Any Transfer that does not comply with this Section 4(b) shall be void *ab initio*.  For greater certainty, where a Supporting Noteholder assigns all of its Relevant Notes pursuant to this Section 4(b), this Support Agreement shall continue to be binding upon such Supporting Noteholder with respect to any Second Lien Notes it subsequently acquires;

  (ii)  except as contemplated by this Support Agreement, deposit any of its Relevant Notes or Debt into a voting trust, or grant (or permit to be granted) any proxies or powers of attorney or attorney in fact, or enter into a voting agreement, understanding or arrangement, with respect to the voting of its Relevant Notes or Debt if such trust, grant, agreement, understanding or arrangement would in any manner restrict the ability of

the Supporting Noteholder to comply with its obligations under this Support Agreement, including the obligations in this Section 4;

(c)    not to take any action, or omit to take any action, that is inconsistent with its obligations under this Support Agreement or that would frustrate, hinder or delay the consummation of the Restructuring Transaction and the Plan;

(d)    to vote (or cause to be voted) all of its Relevant Notes and Debt:

    (i)    in favour of the approval, consent, ratification and adoption of the Plan (and any actions required in furtherance thereof) in accordance with the terms herein; and

    (ii)    against the approval, consent, ratification and adoption of any matter or transaction that, if approved, consented to, ratified or adopted could reasonably be expected to delay, challenge, frustrate or hinder the consummation of the Restructuring Transaction or the Plan, as applicable, except if it is in respect of an Other Transaction that the Company has provided to the Supporting Noteholders or the Advisors for approval in accordance with Section 10 hereof,

and that it shall tender its proxy for any such vote in compliance with any deadlines set forth in respect thereof;

(e)    not to propose, file, solicit, vote for or otherwise support any alternative offer, restructuring, liquidation, workout or plan of compromise or arrangement or reorganization of, for or involving Golfsmith, including any proceeding that is inconsistent with the Restructuring Transaction and the Plan, except with the prior written consent of the Companies or in connection with an Other Transaction in accordance with Section 10 hereof;

(f)    to execute any and all documents and perform any and all commercially reasonable acts required by this Support Agreement to satisfy its obligations hereunder including any consent, approval, amendment or waiver requested by the Company, acting reasonably;

(g)    to use commercially reasonable efforts to assist in dialogue and discussions with other Noteholders to gather additional support for the Restructuring Transaction and the Company shall inform the Supporting Noteholders of the substance of any material discussions and the identity of the other Noteholders on a confidential basis upon such Noteholder's consent thereto;

(h)    to support and assist the Company in seeking a replacement and refinancing of the First Lien Credit Facility;

(i)    to support and instruct the Advisors to support all motions filed by the Companies in the Proceedings that are in furtherance of, and consistent with, the Restructuring Transaction and the Plan and, if requested by the Companies,

provide commercially reasonable information to the Companies in obtaining any required approvals to effect the Restructuring Transaction;

(j)    to support the Golf Town Transaction and not to take any action (including, without limitation, proposing, filing, soliciting, voting for or otherwise supporting any alternative offer, restructuring, liquidation, workout or plan of compromise or arrangement or reorganization of, for or involving Golf Town, except with the prior written consent of the Companies), or omit to take any action, that would frustrate, hinder or delay the consummation of the Golf Town Transaction;

(k)    support the Transition Services Agreement being assumed, upheld and implemented during the Restructuring consistent with the Golf Town APA;

(l)    not to accelerate or enforce or take any action or initiate any proceeding to accelerate or enforce the payment or repayment of any of its Debt and not to support any other Person in taking any of the foregoing enforcement actions;

(m)    to the existence and factual details of this Support Agreement being set out in any public disclosure made by the Companies, including, without limitation, press releases and court materials, and to the filing of this Support Agreement with the Courts in connection with the Proceedings, provided that the Companies shall provide a draft of any such disclosure to the Advisors before it is publicly disseminated for their review and comment;

(n)    to waive any defaults or events of default under the Second Lien Notes Indenture that may occur as a result of (i) the commencement and/or continuation of the Proceedings in conformity with this Support Agreement; and (ii) the pursuit of the Restructuring Transaction, including the entering into of any related documents, as specifically contemplated by this Support Agreement; and, in all such cases, (i) to not take any enforcement steps in connection therewith, and (ii) to the extent permitted pursuant to the Second Lien Notes Indenture, cause or instruct the Second Lien Trustee to waive any defaults or events of default, and to refrain from taking any enforcement steps, with respect to the matters set forth in this paragraph 4(n);

(o)    to consent to a stay of any existing and potential defaults in connection with their Debt; and

(p)    that this Support Agreement shall in no way be construed to preclude a Supporting Noteholder from acquiring additional Second Lien Notes (collectively, the "**Additional Notes**") that are not otherwise subject to this Support Agreement; *provided, however,* that such Additional Notes shall automatically and immediately upon acquisition by a Supporting Noteholder be deemed to constitute Relevant Notes (and together with all accrued and unpaid interest and any other amount that the Supporting Noteholder is entitled to claim in respect of the Additional Notes pursuant to the Second Lien Notes Indenture or otherwise shall be deemed to constitute Debt) hereunder subject to the terms of

this Support Agreement, and the Supporting Noteholder hereby agrees to provide written notice to the Companies advising of (i) the acquisition by it of Additional Notes, (ii) the principal amount of Additional Notes so acquired, and (iii) the date of such acquisition, within three (3) Business Days of any such acquisition.

5.    **Company's Covenants**

Subject to, and in consideration of, the matters set forth in Section 4 above, the Company hereby acknowledges, covenants and agrees:

(a)    to the Restructuring Transaction Terms;

(b)    to pursue the completion of the Restructuring Transaction on a timely basis and in good faith by way of the Plan, and not to take any action (or inaction) that is inconsistent with the terms of this Support Agreement;

(c)    to seek and use commercially reasonable efforts to obtain U.S. Court approval of this Support Agreement no later than fourteen (14) days after the commencement of the U.S. Proceedings;

(d)    to seek Canadian Court approval of the Golf Town Transaction no later than fourteen (14) days after the commencement of the Canadian Proceedings;

(e)    to file the Plan on a timely basis, recommend to any person entitled to vote on the Plan that they vote to approve the Plan and take all reasonable actions necessary to obtain any regulatory approvals for the Restructuring Transaction and to achieve the following timeline (which timeline may be extended at any time as agreed by the Parties):

(i)    the Plan shall have been confirmed by the U.S. Court pursuant to the Final Order by no later than December 23, 2016; and

(ii)    the Restructuring Transaction shall have been implemented pursuant to the Plan on or prior to the Outside Date;

(f)    to obtain a court order approving the Transition Services Agreement in the U.S. Proceedings, and to include the Transition Services Agreement as an assumed contract in the Plan or any going concern sale conducted in the U.S. Proceedings under Section 363 of the U.S. Code;

(g)    to obtain all required consents and approvals for its performance of the Transition Services Agreement;

(h)    to provide draft copies of all motions or applications and other documents with respect to the Restructuring Transaction and the Plan that the Companies are intending to be filed with the Courts in connection with the Proceedings to Stikeman Elliott LLP at least three (3) Business Days prior to the date when the Companies intend to file or otherwise disseminate such documents (or, where

circumstances make it impracticable to allow for three (3) Business Days' review, with as much opportunity for review and comment as is practically possible in the circumstances), and all such filings shall be on terms consistent with this Support Agreement;

(i)     to operate its business in the ordinary course on substantially similar terms as contemplated in the restructuring plan presented to the Advisors, except for such effects as may be caused by commencement of the Proceedings;

(j)     to complete the Company's restructuring and recapitalization transaction for the Golfsmith business on substantially similar terms as contemplated in the restructuring plan presented to the Advisors, including, without limitation, the Company may market and sell the owned real estate in Austin, Texas and use the proceeds thereof to pay down the First Lien Credit Facility;

(k)     to promptly notify the Advisors of any claims brought against it which may reasonably be expected to materially impede or delay the consummation of the Restructuring Transaction or the Plan; and

(l)     to complete the Golf Town Transaction on or before December 1, 2016 or such later date as may be agreed to by the Companies and the Supporting Noteholders, acting reasonably.

## 6.     Negotiation of Documents

(a)     The Parties shall cooperate with each other and shall coordinate their activities (to the extent practicable) in respect of (i) the timely satisfaction of conditions with respect to the effectiveness of the Restructuring Transaction and the Plan, (ii) all matters concerning the consummation of the Restructuring Transaction and the Plan, and (iii) the pursuit and support of the Restructuring Transaction and the Plan. Furthermore, subject to the terms hereof, each of the Parties shall take such actions as may be reasonably necessary to carry out the purposes and intent of this Support Agreement.

(b)     Each Party hereby covenants and agrees (i) to cooperate and negotiate in good faith, and consistent with this Support Agreement, the definitive documents implementing, achieving and relating to the Restructuring Transaction and the Plan, all ancillary documents relating thereto, and any orders of the Courts relating thereto, and (ii) to the extent it is a party thereto, to execute, deliver and perform its obligations under such documents.

## 7.     Conditions to Supporting Noteholder's Support Obligations

The obligation of the Supporting Noteholders to vote in favour of the Plan pursuant to Section 4(d)(i) shall be subject to the satisfaction of the following conditions, each of which may be waived, in whole or in part, by the Supporting Noteholders (provided that such conditions shall not be enforceable by the Supporting Noteholders if any failure to

satisfy such conditions results from an action, error or omission by or within the control of the Supporting Noteholder seeking enforcement):

(a)     the Company shall have executed this Support Agreement;

(b)     the Company has executed a binding agreement for the Golf Town Transaction with the Canadian Purchaser;

(c)     the Plan and all transaction documents relating to the Restructuring Transaction and the Plan shall be on terms consistent with this Support Agreement and shall be acceptable to the Supporting Noteholders, acting reasonably;

(d)     the Supporting Noteholders shall have approved the composition of the board of directors or managers of Restructured Golfsmith, acting reasonably;

(e)     all orders made and judgments rendered by any competent court of law and all rulings and decrees of any competent regulatory body, agent or official in respect of the U.S. Proceedings and the Restructuring Transaction shall be satisfactory to the Supporting Noteholders, acting reasonably;

(f)     the Company shall have complied in all material respects with each covenant and obligation in this Support Agreement that is to be performed on or before the date that is three (3) Business Days prior to the Voting Deadline (subject to any agreed upon extension of the milestones set out herein);

(g)     since the date hereof, there shall not exist or have occurred any Material Adverse Change;

(h)     there shall not be in effect any final decision, order or decree by a Governmental Entity that materially restrains, impedes or prohibits the Restructuring Transaction or requires or purports to require a material variation of the Restructuring Transaction;

(i)     all actions taken by the Company in furtherance of the Restructuring Transaction and the Plan shall be consistent in all material respects with this Support Agreement; and

(j)     the Company shall be in material compliance with all of its respective commitments and obligations under or in respect of this Support Agreement.

**8.     Conditions to the Restructuring Transaction**

(a)     The Restructuring Transaction shall be subject to the satisfaction of the following conditions prior to or at the time the Restructuring Transaction is implemented (the "**Effective Time**") each of which is for the mutual benefit of the Company, on the one hand, and the Supporting Noteholders, on the other hand, and may be waived in whole or in part jointly by the Company and the Supporting Noteholders (provided that such conditions shall not be enforceable

by the Company or the Supporting Noteholders, as the case may be, if any failure to satisfy such conditions results from an action, error or omission by or within the control of the Party seeking enforcement):

(i)      the Plan shall have been approved by (A) the Court; and (B) the requisite majority of affected creditors;

(ii)     the Plan shall have been approved and the Final Order shall have been issued (the consummation, operation or effect of which shall not have been stayed, varied in a manner not acceptable to the Company or the Supporting Noteholders, vacated or subject to pending appeal and as to which order any appeal periods relating thereto shall have expired);

(iii)    the Plan and all material transaction documents relating to the Restructuring Transaction and the Plan shall be in form and substance satisfactory to the Company and the Supporting Noteholders, acting reasonably;

(iv)    the Golf Town Transaction is approved by the Canadian Court and consummated;

(v)     all disclosure documents (including press releases) in respect of the Restructuring Transaction shall be in form and substance acceptable to the Company and the Supporting Noteholders, each acting reasonably, provided that nothing herein shall prevent a Party from making public disclosure in respect of the Restructuring Transaction to the extent required by applicable Law;

(vi)    all required stakeholder, regulatory, Court approvals, consents, waivers and filings shall have been obtained or made, as applicable, on terms satisfactory to the Company and the Supporting Noteholders, each acting reasonably;

(vii)   the Company shall have entered into the New Credit Facility for Restructured Golfsmith acceptable to Golfsmith and the Supporting Noteholders, acting reasonably;

(viii)  all filings that are required under applicable Laws in connection with the Restructuring Transaction shall have been made and any material regulatory consents or approvals that are required in connection with the Restructuring Transaction shall have been obtained and, in the case of waiting or suspensory periods, such waiting or suspensory periods shall have expired or been terminated;

(ix)    there shall not be in effect any preliminary or final decision, order or decree by a Governmental Entity, no application shall have been made to any Governmental Entity, and no action or investigation shall have been commenced by any Governmental Entity, in consequence of or in

connection with the Restructuring Transaction or the Plan that materially restrains, impedes or prohibits (or if granted would reasonably be expected to materially restrain, impede or prohibit), the Restructuring Transaction or the Plan or requires or purports to require a material variation of the Restructuring Transaction Terms;

(x)     the Effective Date shall have occurred no later than the Outside Date; and

(xi)    the reasonable and documented fees and expenses of Kasowitz Torres & Friedman LLP and Scotiabank (in the case of Scotiabank, to a maximum of CDN$1.5 million) shall have been paid or satisfactory provision made for payment thereof in the Plan;

(b)     The obligations of the Company to complete the Restructuring Transaction and the other transactions contemplated hereby are subject to the satisfaction of the following conditions prior to or at the Effective Time, each of which is for the benefit of the Company and may be waived, in whole or in part, by the Company (provided that such conditions shall not be enforceable by the Company if any failure to satisfy such conditions results from an action, error or omission by or within the control of the Company):

(i)     each of the Supporting Noteholders shall have complied in all material respects with each covenant and obligation in this Support Agreement that is to be performed by it on or before the Effective Time;

(ii)    the representations and warranties of each of the Supporting Noteholders set forth in this Support Agreement shall be true and correct in all material respects as of the Effective Date with the same force and effect as if made at and as of such date, except (i) that representations and warranties that are given as of a specified date shall be true and correct in all material respects as of such date and (ii) as such representations and warranties may be affected by the occurrence of events or transactions contemplated and permitted by this Support Agreement; and

(iii)   all orders made and judgments rendered by any competent court of law, and all rulings and decrees of any competent regulatory body, agent or official in relation to the Proceedings shall be satisfactory to the Company.

(c)     The obligations of the Supporting Noteholders to complete the Restructuring Transaction and the other transactions contemplated hereby are subject to the satisfaction of the following conditions prior to or at the Effective Time, each of which is for the benefit of the Supporting Noteholders and may be waived, in whole or in part, by the Supporting Noteholders (provided that such conditions shall not be enforceable by the Supporting Noteholders if any failure to satisfy such conditions results from an action, error or omission by or within the control of the Supporting Noteholder seeking enforcement):

(i)     the Company shall have complied in all material respects with each covenant and obligation in this Support Agreement that is to be performed by them on or before the Effective Date (including achieving the milestones set out in Section 5(c));

(ii)    the representations and warranties of the Company set forth in this Support Agreement shall be true and correct in all material respects as of the Effective Date with the same force and effect as if made at and as of such date, except (i) that representations and warranties that are given as of a specified date shall be true and correct in all material respects as of such date and (ii) as such representations and warranties may be affected by the occurrence of events or transactions contemplated and permitted by this Support Agreement;

(iii)   all actions taken by the Company in furtherance of the Restructuring Transaction and the Plan shall be consistent in all material respects with the Plan and this Support Agreement;

(iv)    the Transition Services Agreement is approved by the U.S. Court as provided herein, and remains in full force and effect; and

(v)     since the date hereof, there shall not exist or have occurred any Material Adverse Change.

**9.      Releases**

The Parties agree that there shall be usual and customary releases and exculpations in connection with the consummation of the Restructuring Transaction under the Proceedings to be effective as of the Effective Date pursuant to the Plan, the Final Order and, if applicable, an Order of the Canadian Court.

**10.     Other Transaction**

(a)     Notwithstanding any other provision herein, Golfsmith shall be permitted to, and not be restricted in any way or manner from, at any time and from time to time, directly or indirectly (a) soliciting, initiating, encouraging, engaging in or responding to any inquiries, submissions, proposals or offers regarding any Other Transaction; (b) encouraging or participating in any discussions or negotiations regarding any Other Transaction, (c) providing any information to, or otherwise cooperating in any way with, any Person in connection with any Other Transaction or (d) entering into any agreement related to an Other Transaction which would provide aggregate cash proceeds to the Noteholders in excess of the aggregate principal amount of the New Second Lien Notes or is otherwise on terms acceptable to the Majority Supporting Noteholders, provided such Other Transaction provides for assumption and fulfillment of obligations under the Transition Services Agreement by a party and in a form acceptable to the Canadian Purchaser, acting reasonably.

(b)     Golfsmith shall promptly (and in any event within one Business Day of receipt) notify the Advisors of its receipt of a written proposal in respect of any Other Transaction. The Advisors may in turn disclose such information to those of the Supporting Noteholders which have entered into confidentiality agreements acceptable to the Company, acting reasonably. Subject to the foregoing, the Company shall provide such Supporting Noteholders and the Advisors with a copy of any proposed Other Transaction within three Business Days of receipt thereof. The Company shall keep the Advisors and any such Supporting Noteholders informed of the status and of any change to the material terms of any such proposed Other Transaction.

## 11.    Termination

(a)     This Support Agreement may be terminated by the Supporting Noteholders in their sole discretion, by providing written notice to the Company:

> (i)     if the Company fails to meet any of the milestones set forth in Section 5(c) within the times set forth therein (as such times may be extended in accordance with Section 5(c));

> (ii)     if Golfsmith enters into a written agreement to pursue an Other Transaction or determines that it will be liquidating all or substantially all of its assets without the consent of the Majority Supporting Noteholders;

> (iii)     if the Company has failed to comply with, or defaulted in the performance or observance of, any material term, condition, covenant or agreement set for in this Support Agreement that, if capable of being cured, is not cured within three (3) Business Days after receipt of written notice of such failure or default and provided that, for greater certainty, no cure period shall apply with respect to any termination pursuant to Sections 11(a)(i), 11(a)(ii), 11(a)(vi) or 11(a)(viii);

> (iv)     any representation, warranty or acknowledgement of the Company made in this Support Agreement shall prove untrue in any material respect as of the date when made;

> (v)     upon the issuance of any final decision, order or decree by a Governmental Entity, which materially restrains, impedes or prohibits the Restructuring Transaction or the Plan;

> (vi)     if the U.S. Proceedings are dismissed or a receiver, interim receiver, receiver and manager, trustee in bankruptcy, examiner with expanded powers, liquidator or administrator is appointed with respect to Golfsmith, unless such appointment is made with the prior written consent of the Supporting Noteholders;

> (vii)     the amendment, modification or filing of a pleading by the Company seeking to amend or modify the Restructuring Transaction Terms or the

14

Plan in a manner that would materially affect the treatment of the Supporting Noteholders that is not acceptable to the Supporting Noteholders, acting reasonably; or

(viii)   if the Restructuring Transaction has not been completed and the Plan has not been implemented by the Outside Date;

in each case unless the event giving rise to the termination right is waived or cured in accordance with the terms hereof.

(b)    This Support Agreement may be terminated by the Company in its sole discretion, by providing written notice to the Supporting Noteholders, provided that the Company is not in default hereunder, upon the occurrence and continuation of any of the following events:

(i)    if Golfsmith decides to proceed with an Other Transaction as permitted under Section 10 hereof;

(ii)    upon the issuance of any final decision, order or decree by a Governmental Entity, in consequence of or in connection with the Restructuring Transaction or the Plan, which restrains, impedes or prohibits the Restructuring Transaction or the Plan; or

(iii)    if the Restructuring Transaction has not been completed and the Plan has not been implemented by the Outside Date;

in each case unless the event giving rise to the termination right is waived or cured in accordance with the terms hereof.

(c)    This Support Agreement may be terminated by the Company in its sole discretion as to a breaching Supporting Noteholder (the "**Breaching Noteholder**") only, by providing written notice to such Breaching Noteholder and provided that the Company is not in default hereunder, upon the occurrence and continuation of any of the following events:

(i)    failure by the Breaching Noteholder to comply in all material respects with, or default by the Breaching Noteholder in the performance or observance of, any material term, condition, covenant or agreement set forth in this Agreement which is not cured within three (3) Business Days after the receipt of written notice of such failure or default; or

(ii)    if any representation, warranty or other statement of the Breaching Noteholder made or deemed to be made in this Agreement shall prove untrue in any material respect as of the date when made;

and the Breaching Noteholder shall thereupon no longer be a Supporting Noteholder, in each case unless the event giving rise to the termination right is waived or cured in accordance with the terms hereof.

(d)     This Support Agreement may be terminated at any time by mutual written consent of the Company and the Supporting Noteholders.

(e)     This Support Agreement shall terminate automatically on the Effective Date upon consummation of the Plan.

(f)     Subject to paragraphs 11(g) and 11(i) below, this Support Agreement, upon its termination, shall be of no further force and effect and each Party hereto shall be automatically and simultaneously released from its commitments, undertakings, and agreements under or related to this Support Agreement.

(g)     Subject to paragraph 11(i) below, upon termination of this Agreement by the Companies with respect to a Breaching Noteholder under Section 11(c), this Agreement shall be of no further force or effect with respect to such Breaching Noteholder and, subject to the right of the Company to pursue any and all legal and equitable rights against a Breaching Noteholder in respect of the circumstances that resulted in them becoming a Breaching Noteholder, all rights, obligations, commitments, undertakings, and agreements under or related to this Agreement of or in respect of such Breaching Noteholder shall be of no further force or effect, except for the rights and obligations under Section 15, all of which shall survive such termination.

(h)     Each Party shall be responsible and shall remain liable for any breach of this Support Agreement by such Party occurring prior to the termination of this Support Agreement.

(i)     Notwithstanding the termination of this Support Agreement pursuant to this Section 11(a), the agreements and obligations of the Parties in Section 15 shall survive such termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

## 12.     Further Assurances

Each Party shall take all such actions as are commercially reasonable, deliver to the other Parties such further information and documents and execute and deliver to the other Parties such further instruments and agreements as another Party shall reasonably request to consummate or confirm the transactions provided for in this Support Agreement, to accomplish the purpose of this Support Agreement or to assure to the other Party the benefits of this Support Agreement, including, the consummation of the Restructuring Transaction (or an Alternative Transaction, if applicable).

## 13.     Public Disclosure

No information with respect to the principal amount of Second Lien Notes held or managed by any individual Supporting Noteholder shall be disclosed by the Company or any of its affiliates, except as may be required by applicable Law or by any regulatory authority having jurisdiction over the Company, or by any court of competent

jurisdiction; provided, however, that the aggregate amount of Relevant Notes held by the Supporting Noteholders collectively may be disclosed.

14. **Approval, Consent, Waiver, Amendment, Termination of or by Supporting Noteholders**

(a)     Notwithstanding any other provision herein, where this Support Agreement provides that a matter shall have been approved, agreed to, consented to, waived, amended or terminated by the Supporting Noteholders, or that a matter must be satisfactory or acceptable to the Supporting Noteholders, such approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance or other action shall be effective or shall have been obtained or satisfied, as the case may be, for the purposes of this Support Agreement where Supporting Noteholders, holding at least 65% of the aggregate principal amount of all Relevant Notes held by the Supporting Noteholders (the "**Majority Supporting Noteholders**") shall have confirmed their approval, consent, waiver, amendment, termination, satisfaction or acceptance, as the case may be, to the Company or to the Advisors, in which case the Advisors shall communicate (which may be by email) any such approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance, or other action to (i) the Supporting Noteholders, and (ii) the Company for purposes of this Agreement and the terms and conditions hereof. The Company shall be entitled to rely on any such confirmation of approval, agreement, consent, waiver, amendment, termination, satisfaction, acceptance, or other action communicated to the Company by the Advisors without any obligation to inquire into the Advisors' authority to do so on behalf of the Supporting Noteholders, as the case may be, and such communication shall be effective for all purposes of this Support Agreement and the terms and conditions hereof.

(b)     Except as expressly set forth in this Agreement, no Supporting Noteholder shall enter into any agreement or understanding with any other Supporting Noteholder which requires any voting threshold higher than that which is set forth in Section 14(a). Each Supporting Noteholder represents and warrants to the Company that it has not entered into any such agreement or understanding.

15. **Miscellaneous**

(a)     The headings in this Support Agreement are for reference only and shall not affect the meaning or interpretation of this Support Agreement.

(b)     Unless the context otherwise requires, words importing the singular shall include the plural and vice versa and words importing any gender shall include all genders.

(c)     This Support Agreement (including the Term Sheet and the other schedules attached to this Support Agreement) constitute the entire agreement and supersede

17

all prior agreements and understandings, both oral and written, among the Parties with respect to the subject matter hereof.

(d)    This Support Agreement may be modified, amended or supplemented as to any matter in writing (which may include e-mail) by the Company and the Supporting Noteholders.

(e)    At any time, a Noteholder that is not a Supporting Noteholder may enter into this Support Agreement by executing and delivering a Consent Agreement to the Company pursuant to Section 15(m) hereof.

(f)    Any Person signing this Support Agreement in a representative capacity (i) represents and warrants that he/she is authorized to sign this Support Agreement on behalf of the Party he/she represents and that his/her signature upon this Support Agreement will bind the represented Party to the terms hereof, and (ii) acknowledges that the other Parties hereto have relied upon such representation and warranty.

(g)    Any provision of this Support Agreement may be waived if, and only if, such waiver is in writing (which may include e-mail) by the Party against whom the waiver is to be effective. No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise.

(h)    Any date, time or period referred to in this Support Agreement shall be of the essence except to the extent to which the Parties agree in writing to vary any date, time or period, in which event the varied date, time or period shall be of the essence.

(i)    This Support Agreement shall be governed by, construed and interpreted in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein (excluding any conflict of laws rule or principle which might refer such construction to the laws of another jurisdiction) and all actions or proceedings arising out of or relating to this Support Agreement shall be heard and determined exclusively in the courts of the Province of Ontario.

(j)    It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Support Agreement, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach, including an order by a court of competent jurisdiction requiring any Party to comply promptly with any of such obligations.

(k)    Unless expressly stated otherwise herein, this Support Agreement is intended to solely bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives. No other person or entity shall be a third party beneficiary hereof.

(l)   No Party may assign, delegate or otherwise transfer any of its rights, interests or obligations under this Support Agreement without the prior written consent of the other Parties hereto.

(m)   All notices, requests, consents and other communications hereunder to any Party shall be deemed to be sufficient if contained in a written instrument delivered in person or sent by facsimile, internationally-recognized overnight courier or email. All notices required or permitted hereunder shall be deemed effectively given: (i) upon personal delivery to the Party to be notified, (ii) when sent by facsimile or email if sent during normal business hours of the recipient, if not, then on the next Business Day of the recipient; or (iii) one (1) Business Day after deposit with an internationally recognized overnight courier, specifying next day delivery, with written verification of receipt. All deliveries required or permitted hereunder shall be deemed effectively made: (A) upon personal delivery to the Party receiving the delivery; (B) one (1) Business Day after deposit with an internationally recognized overnight courier, specifying next day delivery, with written verification of receipt; or (C) upon receipt of delivery in accordance with instructions given by the Party receiving the delivery. Any Party may change the address to which notice should be given to such Party by providing written notice to the other Parties hereto of such change. The address, facsimile and email for each of the Parties shall be as follows:

(i)   If to the Company or Companies at:

Golfsmith International Holdings, Inc. / Golf Town Canada Inc.
c/o Goodmans LLP
333 Bay Street, Suite 3400
Toronto, Ontario
M5H 2S7

Attention: Robert J. Chadwick & Melaney Wagner
Facsimile: 416.979.1234
Email: rchadwick@goodmans.ca / mwagner@goodmans.ca

With a required copy (which shall not be deemed notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY
10153

Attention: Michael Walsh
Facsimile: 212.310.8007
Email: michael.walsh@weil.com

(ii)     If to the Supporting Noteholders at:

the address set forth for the Supporting Noteholder at the address shown for it beside its signature

With a required copy (which shall not be deemed notice) to:

Stikeman Elliott LLP
199 Bay Street, Suite 5300
Toronto, Ontario
M5L 1B9

Attention: Elizabeth Pillon
Facsimile: 416.947.0866
Email: lpillon@stikeman.com

And a copy (which shall not be deemed notice) to:

Kasowitz Benson Torres & Friedman LLP
1633 Broadway
New York, NY
10019

Attention: Andrew Glenn
Facsimile: 212.506.1800
Email: aglenn@kasowitz.com

(n)     If any term, provision, covenant or restriction of this Support Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the provisions, including terms, covenants and restrictions, of this Support Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated and the parties shall negotiate in good faith to modify this Support Agreement to preserve each party's anticipated benefits under this Support Agreement.

(o)     This Support Agreement may be executed by facsimile or other electronic means and in one or more counterparts, all of which shall be considered one and the same agreement.

*[Remainder of Page Intentionally Left Blank]*

**IN WITNESS WHEREOF,** the undersigned has caused this Support Agreement to be duly executed and delivered by its proper and duly authorized officer as of the date first written above.

**GOLFSMITH INTERNATIONAL HOLDINGS, INC.**

Per: _____

Name:

Title:


Per: _____

Name:

Title:

**IN WITNESS WHEREOF**, the undersigned has caused this Support Agreement to be duly executed and delivered by its proper and duly authorized officer as of the date first written above.

**NORTHBRIDGE GENERAL INSURANCE CORPORATION, By its Investment Manager. HAMBLIN WATSA INVESTMENT COUNSEL LTD.**

Per: _____

Name:  Paul Rivett
Title:    Chief Operating Officer

Address: 95 Wellington St W, Suite 802
_____Toronto, ON M5J 2N7
_____
_____

| Principal Amount of Second Lien Notes subject to this Support Agreement: | ████████ |
|---|---|

**IN WITNESS WHEREOF**, the undersigned has caused this Support Agreement to be duly executed and delivered by its proper and duly authorized officer as of the date first written above.

**CI INVESTMENTS INC.** on behalf of certain funds managed by it

Per: _____

Name: Greg Shin

Title: SVP

Address: 2 Queen St. East

Twentieth Floor

Toronto Ontario

M5C 3G7

| Principal Amount of Second Lien Notes subject to this Support Agreement: | ███████████ |
|---|---|

## SCHEDULE A

## DEFINITIONS

"**Advisors**" means Stikeman Elliott LLP, Kasowitz Benson Torres & Friedman LLP and Scotiabank, as legal and financial advisors, respectively, to the Supporting Noteholders.

"**Business Day**" means each day, other than a Saturday or Sunday or a statutory or civic holiday, on which banks are open for business in Toronto, Ontario.

"**Canadian Purchaser**" means Fairfax Financial Holdings Ltd. and CI Investments Inc., as trustee and manager, on behalf of certain investment funds managed by it.

"**Companies**" means collectively, Golfsmith and Golf Town.

"**Courts**" means the U.S. Court and the Canadian Court.

"**Disclosure Statement Order**" means an order of the U.S. Court in form and substance acceptable to the Supporting Noteholders, acting reasonably, that, *inter alia*, approves the disclosure statement for the Plan and authorizes balloting for the Plan.

"**Effective Date**" means the date on which the Restructuring Transaction is implemented pursuant to the Plan.

"**Final Order**" means a final order of the U.S. Court pursuant to the U.S. Code, in form and substance acceptable to the Supporting Noteholders, acting reasonably, that, *inter alia*, approves the Plan.

"**First Lien Credit Facility**" means the credit facility provided to Golfsmith and Golf Town pursuant to a credit agreement dated July 24, 2012 with the lenders party thereto and Antares Capital LP, as agent.

"**Golf Town**" means collectively, Golf Town Canada Holdings Inc. and its direct and indirect wholly-owned subsidiaries.

"**Golf Town Transaction**" means the sale of substantially all of the assets of Golf Town under an asset purchase agreement dated as of the date hereof among Golf Town and a newly incorporated entity owned by the Canadian Purchaser to be implemented in the Canadian Proceedings.

"**Governmental Entity**" means any government, regulatory authority, governmental department, agency, commission, bureau, official, minister, Crown corporation, court, board, tribunal or dispute settlement panel or other law, rule or regulation-making organization or entity: (a) having or purporting to have jurisdiction on behalf of any nation, province, territory or state or any other geographic or political subdivision of any of them; or (b) exercising, or entitled or purporting to exercise any administrative, executive, judicial, legislative, policy, regulatory or taxing authority or power.

"**Law**" or "**Laws**" means any law, statute, order, decree, consent decree, judgment, rule regulation, ordinance or other pronouncement having the effect of law whether in Canada, the United States or any other country, or any domestic or foreign state, county, province, city or other political subdivision or of any Governmental Entity.

"**Material Adverse Change**" means any event, change, circumstance or effect occurring up to and including the closing of the Restructuring Transaction that is reasonably likely to be or become, individually or in the aggregate, materially adverse to Golfsmith (taken as a whole), provided that none of the following shall constitute a Material Adverse Change: (a) any change in applicable accounting standards; (b) any change in global, national or regional political conditions (including the outbreak of war or acts of terrorism) or in general economic, business, regulatory, political or market conditions or in national or global financial or capital markets; (c) any change resulting from the commencement of the Proceedings, the execution, announcement, performance or consummation of the Golf Town Transaction, this Support Agreement, the Plan, the Restructuring Transaction or any other agreement related to the foregoing; (d) any change in the market price or trading volume of any securities of Golfsmith (it being understood that the underlying facts giving rise to or contributing to such change may be taken into account in determining whether there has been a Material Adverse Change); or (e) the failure, in and of itself, of Golfsmith to meet any internal or public projections, forecasts or estimates of revenues or earnings (it being understood that the underlying facts giving rise to or contributing to such failure may be taken into account in determining whether there has been a Material Adverse Change); or (f) any action taken by Golfsmith in accordance with this Support Agreement, except in the cases of clause (b), to the extent that Golfsmith, taken as a whole, is disproportionately affected as compared with other participants in the industries in which Golfsmith operates.

"**Other Transaction**" means any transaction that is an alternative to the Restructuring Transaction, including, without limitation, any sale or disposition of assets of Golfsmith, including through bidding procedures in respect of a sale under Section 363 of the U.S. Code.

"**Outside Date**" means February 15, 2017, or such other date as the Company and the Supporting Noteholders may agree.

"**Person**" means an individual, a corporation, a partnership, a limited liability company, a trust, an unincorporated association, a Governmental Entity or any agency, instrumentality or political subdivision of a Governmental Entity, or any other entity or body.

"**Proceedings**" means the U.S. Proceedings and the Canadian Proceedings.

"**Second Lien Notes Indenture**" means the indenture dated as of July 24, 2014 among Golf Town Canada Inc. as Canadian issuer, Golfsmith Holdings as U.S. issuer, the guarantors party thereto, as guarantors, and BNY Trust Company of Canada and The Bank of New York Mellon, as trustee and collateral agent.

"**Second Lien Trustee**" means BNY Trust Company of Canada.

- 3 -

"**Transition Services Agreement**" means an agreement to be entered into among Golfsmith and its affiliates and the purchaser in the Golf Town Transaction providing for the provision of shared services by Golfsmith (or a purchaser thereof) for an agreed upon period of time and on agreed upon terms while the purchaser of the Golf Town Transaction transitions the services to the purchased Golf Town business.

"**Voting Deadline**" means the date on which votes are due in respect of the Plan, as established by the Disclosure Statement Order to be entered in the U.S. Proceedings, as the same may be amended by the order of the U.S. Court or with the consent of the Company and the Supporting Noteholders, acting reasonably.

**SCHEDULE B**

**TERMS OF NEW SECOND LIEN NOTES**

The New Second Lien Notes shall be effected under a new senior secured notes indenture (the "**New Second Lien Notes Indenture**") on customary terms for a transaction of this nature, including the following terms:

| | |
|---|---|
| Principal Amount | US$35 million |
| Issuer | Restructured Golfsmith |
| Term | 3 years from the Effective Date plus Restructured Golfsmith's option to extend maturity date on the consent of Noteholders holding in aggregate 66 2/3 % or more principal amount of all New Second Lien Notes |
| Interest | 12.0%, with company option to cash pay or PIK interest |
| Sale of Company/Sale of Assets/Change of Control | 105% of par |
| Callable | 105% of par |
| Security | Secured by all assets of Restructured Golfsmith on a second lien basis behind the New Credit Facility and any amount required in order for Golfsmith to complete its Restructuring Transaction and emerge from the U.S. Proceedings |
| Mandatory Prepayment | 105% of par |
| Other Terms | Other than as set out above, other terms and conditions to be similar to existing Second Lien Notes, having regard to a transaction of this nature |

## SCHEDULE C

## FORM OF CONSENT AGREEMENT

This Consent Agreement is made as of the date below (the "**Consent Agreement**") by the undersigned (the "**Consenting Party**") in connection with the support agreement dated as of September 13, 2016 (the "**Support Agreement**") between Golfsmith International Holdings, Inc. and the Supporting Noteholders. Capitalized terms used herein have the meanings assigned in the Support Agreement unless otherwise defined herein.

**RECITALS:**

A.      The Consenting Party wishes to be bound by the terms of the Support Agreement on the terms and subject to the conditions set forth in this Consent Agreement.

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Consenting Party agrees as follows:

1.      The Consenting Party hereby acknowledges that the Consenting Party has received and reviewed a copy of the Support Agreement.

2.      The Consenting Party hereby agrees to be fully bound as a Supporting Noteholder under the Support Agreement in respect of the Second Lien Notes that are identified on the signature page hereto, and hereby represents and warrants that the Second Lien Notes set out on the signature page hereto constitute all of the Second Lien Notes that are legally or beneficially owned by such Consenting Party or which such Consenting Party has the sole power to vote or dispose of.

3.      The Consenting Party hereby represents and warrants to each of the other Parties that the representations and warranties set forth in Section 2 of the Support Agreement are true and correct with respect to such Consenting Party as if given on the date hereof.

4.      Except as expressly modified hereby, the Support Agreement shall remain in full force and effect, in accordance with its terms.

5.      This Consent Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein, without regard to principles of conflicts of law.

6.      This Consent Agreement may be executed by facsimile or other electronic means and in one or more counterparts, all of which shall be considered one and the same agreement.

*[Remainder of this page intentionally left blank; next page is signature page]*

DATED as of _____.

Name of Supporting Noteholder or Authorized Representative:

- 2 -

Per: _____

_____
Name:

_____
Title:

_____
Address:

_____

| Principal Amount of Second Lien Notes subject to this Support Agreement: | $● |
|---|---|

6608178

**Exhibit C**

**Golfsmith's Directors and Senior Management**

GOLFSMITH INTERNATIONAL HOLDINGS LP,
AND RELATED ENTITIES

OFFICERS AND DIRECTORS

| Golfsmith International Holdings, Inc. | Officers | Directors |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy-GS |
| EIN – 16-1634847 | David Bushland–Vice President & Chief Financial Officer | David Bushland-GS |
| | Rick Hill – Vice President & Secretary | Phil Mauchel-OMERS |
| | Anna Jobe – Vice President & Controller | |

| Golfsmith International, Inc. | Officers | Directors |
|---|---|---|
| USA | David Roussy  – President & Chief Executive Officer | David Roussy |
| EIN – 22-1957337 | David Bushland –  Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Eli Getson – Executive Vice President & General Merchandising Manager | |
| | Rick Hill – Vice President, Chief Information Officer & Secretary | |
| | Craig Harrison – Vice President of Store Operations | |
| | David Diamond – Vice President & Chief Human Resource Officer | |
| | Anna Jobe – Vice President & Controller | |
| | Todd Bushman – Vice President, FP&A | |
| | Kim Lewis – Vice President, Omnichannel Marketing | |

| Golfsmith USA, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN - 74-2882405 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe –Vice President & Controller | |

| Golfsmith NU, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 74-2882404 | David Bushland - Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golfsmith 2 GP, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 45-4532218 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golfsmith Europe, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 74-2882408 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golfsmith Licensing, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 74-3075499 | David Bushland –Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Eli Getson - Vice President | |

| Golfsmith Incentive Services, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 26-2602730 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golf Town USA Holdings Inc. | Officers | Directors |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 27-5557038 | David Bushland – Vice President, Chief Financial Officer, Treasurer and Secretary | David Bushland |

| Golf Town USA, L.L.C. | Officers | Managers |
|---|---|---|
| USA | David Roussy  – President & Chief Executive Officer | David Roussy |
| EIN – 27-2460259 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golf Town USA Holdco Limited | Officers | Managers |
|---|---|---|
| USA | David Roussy - President & Chief Executive Officer | David Roussy |
| EIN – 98-0445562 | David Bushland – Vice President & Chief Financial Officer | David Bushland |
| (Formerly APG) | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| GMAC Holdings, LLC | Officers | Managers |
|---|---|---|
| USA | David Roussy – President & Chief Executive Officer | David Roussy |
| EIN – 46-1263331 | David Bushland – Vice President, Chief Financial Officer & Treasurer | David Bushland |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |

| Golfsmith International, L.P. | Officers | General Partner |
|---|---|---|
| USA | David Roussy - President & Chief Executive Officer | Golfsmith 2 GP, L.L.C. |
| EIN – 74-2864257 | David Bushland – Vice President, Chief Financial Officer & Treasurer | |
| | Rick Hill – Vice President & Secretary | |
| | Anna Jobe – Vice President & Controller | |